SHEPLER, *Plaintiff-Respondent,*
*v.*
WEYERHAEUSER COMPANY,
*Defendant-Appellant.*
(No. 410-645, SC 24345)
569 P2d 1040

Ridgway K. Foley, Jr., and Paul N. Daigle, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, argued the cause and filed briefs for Defendant-Appellant.

Raymond J. Conboy, Portland, argued the cause for Plaintiff-Respondent. With him on the brief were Frank Pozzi and Pozzi, Wilson & Atchison, Portland.

Before Denecke, Chief Justice, and Holman, Howell, Bryson, Lent, Linde, and Bradshaw, Justices.

LENT, J.

## LENT, J.

This is an action for damages for death by wrongful act of another brought by the personal representative of Oren Shepler. Shepler, a longshoreman in the employ of Portland Stevedore Company (Portland), was injured in a fall on December 21, 1972, during the loading of logs in the vessel M/S PACKING. He died from his injuries two days later. The action asserts a right to recover for damages resulting from negligence and involves the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 USC § 901 et seq. The action is against Pacific Coast Shipping Co., the owner of the PACKING, and Weyerhaeuser Co., as charterer of the vessel. The case was tried in December 1975. At the conclusion of plaintiff's case in chief, the trial court granted a directed verdict in favor of Pacific Coast. The jury found Weyerhaeuser at fault. (In using the word "defendant," we refer to Weyerhaeuser.)

Defendant appeals from the judgment entered upon this verdict. We affirm.

Defendant contends that the trial court erred in interpreting the standard of care owed by a vessel to a longshoreman under LHWCA and that a nonsuit or directed verdict should have been entered in its favor. It further complains of the failure of the trial court to instruct the jury on particular matters and attacks various instructions which were given. Additionally, defendant submits that under the LHWCA, where a jury finds the vessel to be only partially at fault it is inequitable to require the vessel to pay the entire damages assessed by the jury. Finally, defendant charges that it was error to exclude evidence that employes of Portland who were witnesses in the trial were biased because Portland had a financial stake in the outcome of the litigation. (Under LHWCA, the stevedore-employer has a lien against third-party recoveries for compensation benefits paid under the

[ 479 ]

Act.) To place these claims of error in perspective, we turn first to the undisputed facts.

The primary issue is to determine whether the evidence is sufficient under the 1972 amendments to support a finding of negligence on the part of defendant. This requires us preliminarily to ascertain the nature of the duty owed under the amendments by the vessel[1] to a longshoreman employed by a master stevedore.

## UNDISPUTED FACTS

Defendant ships logs and lumber to its purchasers throughout the world. In 1972, after a trial voyage, defendant chartered the PACKING. Pacific Coast Shipping, the owner, and Weyerhaeuser executed a "Beizai Charter Party," a modified form of voyage charter, for 24 consecutive voyages, which contained the following provisions:

> "* * * Charterers to load, stow and discharge the cargo free of risks and expenses to owners. Charterers to have the liberty of working all available hatches. The vessel to provide motive power, winches, gins and falls at all times and, if required, to supply light for night work on board free of expenses to charterers."

The owners retained control over cargo stowed on the weather deck, because the height of the deck load would affect the stability of the vessel.

To load the ship for its sixth voyage defendant employed Portland. Defendant had concluded that the amount of cargo carried on previous trips was insufficient. On December 6, 1972, Captain A. B. McKimmey, manager of off-shore cargo operations for defendant, wrote a letter to the master of the PACKING, with a copy to Portland, which stated:

> "* * * When Weyerhaeuser Line first chartered the

---

[1] The term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member. 33 USC § 902(21), (Supp. V, 1975).

[ 480 ]

vessel, it was represented as having a carrying capacity of 4.5 million board feet of logs (Scribner scale).

"To date, the largest load we have been able to put on board has been 4.1 million board feet which has not allowed full use of the vessel to SS charterers.

"On this voyage we intend to full load the vessel to capacity to determine just how much of a load she will actually carry. Our object is to make use of all her cubic space under deck * * *.

"Your cooperation with the Surveyors, Stevedores, and our Supercargo will be appreciated * * *."

The owner responded that carrying capacity is a function of the type of logs stowed as well as the method of storage and observed that the charter agreement was "* * * that you are to have full use of the cubic space under deck." Another representative of defendant rejoined that Captain McKimmey was "new to Weyerhaeuser" and "not entirely familiar with all the chartering arrangements," and that the original letter was "not intended to force a greater tonnage than we are allowed under our charter."[2]

The sixth voyage of the PACKING under the charter commenced with the loading of logs in Astoria, Oregon. The loading of the No. 1 hatch was deferred until the vessel moved up the Columbia River to the Weyerhaeuser dock at Longview, Washington, in order to obtain a better selection of logs and use of a shoreside crane.

There were peculiar difficulties in the loading of the PACKING because of its outmoded design. On modern vessels designed for the stowage of logs, the hatch openings extend nearly the full length of the hatch. On the PACKING, converted as a log carrier, the hatch opening or "square" was considerably smaller than the hatch itself, creating a forward trunk (that part of the hatch forward of the square) of nearly 29

---

[2] As a consecutive voyage charterer under the terms of this particular charter-party, defendant vis-a-vis the longshoremen was in the same position as owner of the vessel. *See* note 1, *ante.*

feet and an aft trunk of 24 feet. As in most log ships, there are no intermediate decks, and the hatch is open from the main deck to the ship's bottom, a depth of approximately 40 feet.

Because of the hatch configuration, stowed logs could not be butted tightly against the aft bulkhead because, as the longshoremen attempted to swing and land the load aft of the square, the slings used to carry the load would strike the hatch coaming.

The physical work of loading logs aboard the vessel, both at Astoria and Longview, was performed by Portland pursuant to its contract with defendant. The contract called for a "cost-plus, fixed-fee commodity rate." In other words, defendant was to pay the actual cost of labor in addition to a fixed fee determined by the quantity of stowage.

Loading operations commenced at Longview on December 20, 1972. Two Weyerhaeuser employes, a loading superintendent and a "supercargo," were in the vicinity during the loading. Supervisory persons of Portland, also, worked on or about the ship. These were the stevedore superintendent, the "walking boss," and, below the "walking boss" in the hierarchy, the gang (or "hatch") boss, who was the immediate supervisor of Shepler.

In an attempt to obtain a tight stow, the longshoremen were "dead-ending." Dead-ending involves securing a "wire" (cable) with a device called a "bear claw" to a stable object and running the wire under the material to be moved. By lifting the load with the crane, the load moves in the direction of the anchored end of the wire. By this method the longshoremen hoped to move logs from the center of the hold to the bulkheads and into the wings.

On December 21, 1972, the hold in Hatch No. 1 was partially loaded. A gap between the stow and the aft bulkhead had developed due to the impossibility of butting the logs tightly against the bulkhead. This

gap, or "hole," was approximately 26 feet deep, and the longshoremen climbed over and about the logs next to the hole, in order to place the wire and bear claw, and down over the ends to unfasten the wire and retrieve the bear claw from the anchoring logs.

Shepler was injured that afternoon while engaged in trying to retrieve a buried bear claw after a load of logs had been moved by dead-ending. Shepler fell and sustained head injuries, from which he died.

## TRIAL RESULT

Two of plaintiff's several allegations of negligence were submitted to the jury; namely, that defendant was negligent: (a) in failing to "authorize" the use of a bull winch[3] under the circumstances, and (b) in requiring the dead-ending of the log drafts. The case was submitted to the jury on special interrogatories, and the jury found that Shepler was not negligent and that defendant's negligence was 28% responsible for Shepler's death and Portland's negligence was 72% responsible.

## SUFFICIENCY OF EVIDENCE

■ Defendant assigns as error the failure to grant its motions for involuntary nonsuit, for a directed verdict and to strike plaintiff's two specifications of negligence which were submitted to the jury. This requires us to determine whether there was sufficient evidence to submit the case to the jury upon those two specifications.

Neither party directs our attention to the scope of review which we exercise in a case arising under 33 USC, § 905(b). It could be argued that our scope of review is the same as that of a United States Court of Appeals reviewing a federal district court decision. If that were so, our task would be to determine whether

---

[3] A bull winch (sometimes called a stowing machine or stowing winch) is a small gas double drum donkey set up on deck which supplies the power to utilize a system of pad eyes, blocks and lines in the hold to pull or "yard" the log ends up tight against the bulkhead.

as a matter of law the record is "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Marant v. Farrell Lines, Inc.,* 550 F2d 142, 144 (3d Cir 1977), quoting from *Denneny v. Siegel,* 407 F2d 433, 439 (3d Cir 1969). On the other hand, if our scope of review is that which we ordinarily exercise on appeal in actions on the law side of the court, we are probably more limited. Since the verdict was for plaintiff, we could not find error in these respects unless we could affirmatively say there is no evidence to support the verdict.[4] Furthermore, we should be precluded from weighing the evidence and should be required to consider it in the light most favorable to plaintiff,[5] together with all inferences favorable to plaintiff which could be reasonably drawn from such evidence.[6]

We have concluded that under either test the evidence was sufficient to present a jury case, and, therefore, there was no error in this respect.

■ The task of the jury, of course, is to weigh the evidence, judge the credibility of the witnesses and the reliability of their testimony, and to resolve all conflicts in the evidence. In performing that task in this case, the jury had before it evidence from which it could have found further facts in addition to the undisputed facts already discussed.

### FURTHER FACTS

While the vessel was still at Astoria, defendant's loading superintendent told Portland's walking boss that the longshoremen were to work to get all available space full of logs. Defendant made the decision to use a shore crane rather than the ship's gear to load this hatch at Longview in an effort to get a tighter stow. Portland's superintendent was aware of Captain McKimmey's letter concerning a tight stow and that

---

[4] Oregon Constitution, Amended Art. VII, § 3.

[5] *Myers v. Cessna Aircraft,* 275 Or 501, 553 P2d 355 (1976).

[6] *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977).

defendant wanted such a stow in this hatch. Defendant's loading superintendent approached Portland's superintendent at Longview and asked if they could get "a real tight stow" on this hatch and what could be done to do so. Portland's man said, "If you want [a] real tight stow, the only way I know how is to put bull winches on there and pull them back to the bulkhead tight." Defendant's supercargo, also, told defendant's loading superintendent that the only way they could utilize the space in the hold "and abide by the instructions" was to use stowing winches. Portland's walking boss and the hatch boss, also, asked for bull winches at least once when both defendant's loading superintendent and supercargo were present. Portland's operations manager (the stevedore superintendent's superior) also spoke to both defendant's loading superintendent and Captain McKimmey about the necessity of using bull winches to get a tight stow. McKimmey discussed the fact that this would entail extra cost.

Bull winches are no longer commonly used, because modern log vessels have large hatch squares with small wings and trunks, which permit logs to be landed in the hold without additional handling required to obtain an adequately tight stow. Portland had bull winches available, however, and they can be used safely if adequate precautions are taken. The use of bull winches would have been more costly to defendant because their use requires two extra longshoremen, one to serve as winch "driver" (operator) and the other as hatch tender to relay signals between the driver and the men in the hold as to the operation of the winch. This additional cost was discussed with defendant's loading superintendent.

After consulting with his supervisor in Tacoma, Washington, by telephone, defendant's loading superintendent informed Portland's personnel that defendant would not authorize the use of bull winches. The gang boss and the walking boss were told by defendant's representative that defendant "wanted a

[ 485 ]

tight stow * * * no matter how long it took." On the following morning, December 21, Portland's hatch boss again tried without success to obtain authorization to use bull winches.

It is the supercargo's duty to supervise the loading of cargo in the sense of what cargo goes into which hold and in what order; however, he does not give orders to the longshoremen. Prior to the vessel's coming in, the supercargo was aware of Captain McKimmey's letter, and through it and orders from defendant's loading superintendent was aware that defendant wanted to get more logs into the hold. The supercargo had discussed with defendant's loading superintendent the use of bull winches, but as above stated the latter's superiors would not authorize that use.

The supercargo ordered the length of logs to be brought shipside under the crane for lifting into the hold. The logs were brought by truck, and the logs in a load were not only of uneven length but, also, neither end of the load was even. This complicated the task of attempting to butt the log ends against the after bulkhead. The supercargo was not getting the logs he wanted from defendant's yard, and seeing that waste space was developing, he again discussed with his loading superintendent that they could carry out defendant's instructions only by using bull winches. The superintendent agreed to take the matter up with his superiors and a short time later told the supercargo such use would not be authorized and that "we were to do the best we could with what we had."

As the work progressed and the hold began to fill "higher up," the more difficult it became to get the log ends close to the aft bulkhead because of lessening of space in which to swing the load. On the morning of the day Shepler fell, the supercargo told defendant's loading superintendent it would be very difficult for the men to work under the conditions existing. A large, deep hole was developing as the stow rose higher

in the hold. It was the biggest hole in a log stow the walking boss had ever seen, and the supervisor knew it to be unusually deep.

Although the Portland employes did not complain to defendant's employes that it was unsafe to achieve what defendant wanted without bulls, and although neither the loading superintendent nor the supercargo specifically ordered the longshoremen to dead-end; nevertheless, dead-ending was the only procedure feasible to attempt to carry out loading instructions in the absence of bull winches. Both the loading superintendent and supercargo were present at the hold from time to time and saw that the longshoremen were dead-ending, using the bear claw, and that the hole aft of the stow was being created. At least the supercargo, if not his superior, knew that dead-ending, which requires a man to work near the ends of wet logs and to go down to affix the wire with a bear claw, and later to remove it when jammed, is a "dangerous procedure," in the supercargo's words. On the other hand, if bull winches were used, the stow would have been tight against the bulkhead, the hole would not have developed, and the men would have had no occasion to work at any deep hole at the ends of the logs. The absence of bull winches and the use of the technique of dead-ending combined to make both the loading procedure itself dangerous and to create a dangerous condition; namely, the hole. The hold thereby became a dangerous place to work.

This method of working log cargo is to be contrasted with a normal log loading operation, in which the longshoremen would merely land the loads and free the slings. Any space left over in the wings or trunks would be "blow" or waste space. Although holes do develop in these stows, there is little danger of falling into a hole, as work is not done at the ends of the loads.

Although the longshoremen don't take orders from the supercargo, he has some responsibility. As he testified, "I think all supervisory personnel have a

responsibility [for safety of personnel] of some type or another. You certainly don't want somebody doing anything unsafe if you see it."

Just prior to his fall, Shepler had climbed down over the ends of the logs between the stow and the bulkhead in an effort to free a jammed, or buried, bear claw. Despite wearing special shoes, he fell from the logs, which were wet from rain, and, although wearing protective headgear, he sustained head injuries which caused his death.

## THE LAW APPLICABLE TO A NEGLIGENCE ACTION UNDER § 905(b)

■ Prior to the 1972 amendments to LHWCA, there existed for some injured longshoremen what has been described as the "third-party circular liability lawsuit."[7] This was the result of two decisions (and their progeny) of the United States Supreme Court. In Seas Shipping Co. v. Sieracki, 328 US 85 (1946), the shipowner's absolute, non-delegable warranty of seaworthiness owed to seamen since *The Osceola*,[8] 189 US 158 (1903), was extended to a longshoreman engaged in working the ship's cargo. In *Ryan Co. v. Pan-Atlantic Corp.,* 350 US 124 (1956), the shipowner's right to indemnity from the longshoreman's employer (stevedore) was established where the unseaworthiness causing the injury was created by the stevedore's breach of its implied warranty to perform its services in a workmanlike manner; i.e., properly and safely.

The circularity of the lawsuit occurred thusly:[9] The

---

[7] It has, also, been described as "triangular." *See Ramirez v. Toko Kaiun K.K.,* 385 F Supp 644, 649 (DC ND Cal. 1974); *Crowshaw v. Koninklijke Nedlloyd, B. V. Rijswijk,* 398 F Supp 1224, 1228 (DC D Or. 1975); Comment, The Injured Longshoreman vs. The Shipowner after 1972: Business Invitees, Land-Based Standards and Assumption of Risk, 28 Hastings Law Journal 771 (1977).

[8] *See also Mitchell v. Trawler Racer, Inc.,* 362 US 539, 549 (1960), for proposition that due diligence by the shipowner will not discharge the duty to furnish a seaworthy vessel.

[9] We do not yet discuss for this background picture of the 1972 amendments that situation in which the longshoreman's recovery against the shipowner was based exclusively upon the latter's negligence. In such cases, of course, the *Ryan* doctrine was inapplicable.

longshoreman would sue the shipowner for damages for personal injuries resulting from the unseaworthiness of the vessel. If the unseaworthiness resulted from a breach of the stevedore's implied warranty to perform stevedoring services in a safe and workmanlike manner, the shipowner would either implead the stevedore or, after judgment for the longshoreman, seek indemnity from the stevedore. This "closed the circle" and resulted usually in the longshoreman receiving indirectly from the employer substantially more than the employer would have had to pay the longshoreman by way of benefits under LHWCA. This circularity did violence to the statutory scheme of LHWCA that the exclusive remedy of the injured longshoreman against his employer was for benefits under the compensation law.[10]

The thrust of the 1972 amendments was to trade a rather substantial increase in compensation benefits for the longshoreman's right to recover damages from the shipowner for personal injuries resulting from the unseaworthiness of the vessel. The injured longshoreman retained a right, however, to bring an action against the shipowner (the "vessel")[11] for injuries resulting from the latter's negligence. The operative section of LHWCA after the 1972 amendment is:

> "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the

---

[10] The employing stevedore did have a lien against the longshoreman's recovery for the amount of compensation benefits the employer had paid under LHWCA, and, thus, the plaintiff did not obtain a double recovery.

[11] See footnote 1.

vessel. * * * The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." 33 USC § 905(b).

The amendment eliminates the longshoreman's strict liability remedy against the shipowner *qua* shipowner[12] and bars the shipowner from shifting his liability for his negligence to the stevedore. Thus, the circular liability lawsuit is laid to rest.

It appears that we are the first state supreme court to be confronted with the task of divining the intent of Congress in the 1972 amendments[13] with respect to the nature of the shipowner's duty as distinguished from the standard of care imposed.[14] Some case law has now emerged through published decisions of the federal district courts and of the courts of appeal for the various maritime circuits; however, there is no consensus as to the point of departure for testing any given set of evidence to determine if it may yield findings of fact which would constitute negligence on the part of the shipowner. The standard of care, on its face, is that imposed by the statute; i.e., that old favorite, reasonable care, or what the reasonably prudent person would, or would not, do in the same or

---

[12] *See Streatch v. Associated Container Transp., Ltd.,* 388 F Supp 935, 940 (D. C.D. Cal. 1975) suggesting that the negligence remedy is to be taken as referring to the shipowner in his capacity as shipowner; therefore, the shipowner may also be vulnerable upon a strict liability theory as a products distributor.

[13] We have already disposed of one appeal in a post-amendment case in *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977), but there the parties tried the case below on the basis of 2 Restatement (Second) of Torts, §§ 343 and 343A (1965); we were not, therefore, required to choose between conflicting contentions as to the nature of the duty and its source.

[14] *See* Theis, Amended Section Five of the Longshoremen's and Harborworkers' Compensation Act, 41 Tenn. L.R. 773, 780 (1974); *but compare,* Deacon, The Injured Longshoreman vs. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk, 28 Hastings L.J. 771 (1977).

similar circumstances to avoid harm to others.[15] The nature of the duty is ignored, however, in the statute. The draftsman tells us only that the vessel owes to the longshoreman a duty to be careful. What precisely is required to discharge the duty does not appear from the statute.

No court which has seriously struggled with this problem has felt free to apply the statutory words as written. Every such court has gone to the legislative history as embodied in the House Report of the Education and Labor Committee, No. 92-1441, September 25, 1972, and the Senate Report of the Labor and Public Welfare Committee, No. 92-1125, September 14, 1972 (hereinafter the Reports). Our task is made more difficult by reason of the fact that some of the federal courts, in purporting to interpret or construe the statute in light of the language of the Reports, have chosen to ignore language in the Reports where such language is inconsistent with the result the court apparently desires to reach in the given case. As a consequence, the federal court decisions are of help to us only in a very general way.

It is tempting to deal with this case under the words of the statute without resort to the Reports, and if all courts did so it would force Congress to "clean up its act." In other words, Congress should set forth in the statute itself several rules which now find expression only in the Reports. To be fair to the litigants before us and to those who may be coming before the trial courts, we shall do what has been done in each circuit and go to the Reports for guidance in ascertaining the nature of the duty of the shipowner to the longshore-

---

[15] "Negligence is conduct falling below the standard established for the protection of others against unreasonable risk of harm. This standard of conduct is ordinarily measured by what the reasonable man of ordinary prudence would do in the circumstances." Fleming, *The Law of Torts* 111 (3d ed 1965). *But compare,* Ehrenzweig, *Negligence Without Fault* (1951), questioning whether, despite lip service thereto, the courts are abandoning the constituent (to negligence) concepts of the "reasonable man" and his "foresight."

man. We, therefore, now set forth those portions of the Reports which we deem pertinent to this discussion and to the decision of this case. In doing so, we shall use the words of the Senate Report, because although the Reports are not identical we believe they do not conflict with each other in substance.[16] The Senate Report, therefore, in pertinent part is as follows:

"* * * * *

"* * * The Committee believes that where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in non-maritime pursuits are liable for damages when, through their fault, a worker is injured.

"* * * * *

"Accordingly, the Committee has concluded that, given the improvement in compensation benefits which this bill would provide, it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness. This would place vessels in the same position, insofar as third party liability is concerned, as landbased third parties in non-maritime pursuits.

"The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'non-delegable duty', or the like.

"Persons to whom compensation is payable under the Act retain the right to recover damages for negligence against the vessel, but under these amendments they cannot bring a damage action under the judicially-

---

[16]The House Report may be found at 3 *United States Code Congressional and Administrative News,* 92d Cong., 2d Sess., 4698-4720, with particular attention to pp. 4701-4705.

enacted doctrine of unseaworthiness. Thus a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores subject to this Act, Crumady vs. The J. H. Fisser, 358 U.S. 423, Albanese vs. Maats, 382 U.S. 283, Skibinski vs. Waterman SS Corp., 330 F.2d 539; for the manner or method in which stevedores or employees of stevedores subject to this Act perform their work, A.N.G. Stevedores vs. Ellerman Lines, 369 U.S. 355, Blassingill vs. Waterman SS. Corp., 336 F 2d 367; for gear or equipment of stevedores or employees of stevedores subject to this Act whether used aboard ship, or ashore, Alaska SS Co. vs. Peterson [sic], 347 U.S. 396, Italia Societa vs. Oregon Stevedoring Co., 376 U.S. 315, or for other categories of unseaworthiness which have been judicially established. This listing of cases is not intended to reflect a judgment as to whether recovery on a particular actual setting could be predicated on the vessel's negligence.

"Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

"So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 [33 USC § 905] would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore.

"Under this standard, as adopted by the Committee, there will of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—

just as they are in cases involving alleged negligence by land-based third parties. The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.

"\* \* \* \* \*

"Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. In that connection, the Committee intends that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall also be applicable.

"\* \* \* \* \*"

Despite the fact that neither the statute nor the committee report anywhere contains any reference to the longshoreman as being a business visitor or invitee on the one hand or to the vessel or shipowner as being in a position equivalent to that of an occupier of land on the other hand, the majority of the courts have proceeded to analyze the nature of the duty as if it were mandated that 2 Restatement (Second) of Torts, §§ 343 and 343A (hereinafter 343 and 343A), are applicable. We believe these courts to have been influenced largely by Vickery, *Some Impacts of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act,* 41 Insurance Counsel Journal 63 (January 1974). Mr. Vickery is practicing

in Houston, Texas, and according to biographical material accompanying his article, "He worked extensively with the Congress on the 1972 Amendments to the Longshoreman's Act as a representative of several Gulf Maritime and Steamship Associations." After first noting that:

"[P]ractitioners believe that the courts will apply 'land' concepts of negligence as against the shipowner and the admiralty concept of comparative negligence as against the plaintiff,[17] as the Congress intends [,] * * *"

he states, apparently without fear of contradiction: "The situation of the shipowner is comparable to that of a landowner or occupier of premises who contracts with an independent contractor to perform services on the premises." He then sets forth a description of the nature of the duty accompanied by copious citations. The seven "principles" which he advocates as being applicable appear to be a paraphrase of 343 and 343A and comments thereto.

That 343 and 343A embody the concept (specifically forbidden by the Reports) of assumption of risk as a duty-limiting factor is apparent from comment *e* to 343A.[18] For judicial recognition of this point, *see, e.g.,*

---

[17] It is interesting that the author speaks of applying the concept of comparative negligence as *against* the plaintiff. We had always assumed that comparative negligence under the general maritime law was something in favor of the plaintiff to ameliorate the harsh doctrine of contributory negligence existing at common law. Also interesting is the fact that the author ignores the committee reports' injunction that the defense of assumption of risk would not be available to the vessel. This is probably because the "principles" which he advocates as being applicable reintroduce the concept of implied assumption of risk.

[18] "e. In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so. Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them."

*Brown v. Ivarans Rederi A/S,* 545 F2d 854, 863 n. 10 (3d Cir 1976).

Apart from the fact that description of the ship-owner's duty by resorting to 343 and 343A introduces the forbidden element of assumption of risk, there is an additional fact even more important for rejecting application of those sections as the proper analysis. No one seriously disputes that the development of the law of torts, and particularly negligence concepts in the field of occupier of land vis-a-vis entrant upon the land, has been largely influenced by the favorable position which land and the rights of owners of land historically have held in English and American law. The scholars usually recognize and comment upon this situation at the outset of their discussions of this relationship:

> "Responsibility for injury on dangerous premises has attracted its own, rather complex pattern of legal rules and withstood to a significant, if diminishing degree, the pervasive tendency to measure the existence and scope of duties of care by the broad standards of foreseeability of harm and reasonable conduct. Until well into the midst of the nineteenth century, the prominent social value attached to landholding defied all serious challenge to the claim by occupiers to untramelled use and enjoyment of their domain with least subordination to the interests of others. Qualified only by such concern for *neighbours* as exacted by the law of nuisance and trespass, the landowner was virtually immune to demands for the safety of persons who came *upon* his land, except not to injure them wilfully, set traps or use excessive force in expelling trespassers. With respect to the conditions of the premises, even a lawful visitor entered for all practical purposes at his own risk. Only belatedly and after protracted judicial groping did this singular tenderness for a sectional interest group begin to yield to the combined thrust of industrialization, with its attendant proliferation of physical dangers, and a growing sense of social responsibility. The eventual adjustment, however, continued to make substantial allowance to the lingering sentiment of the past by falling markedly short of exposing occupiers to the full rigour of the

developing negligence doctrine. Apprehensive of subjecting defendants to the uncontrolled arbitrament of unsympathetic juries, the new formula[1] ensured retention of a large measure of judicial control by the expedient of dividing persons entering land into distinct categories, fixed by reference to the purpose of their visit, with corresponding and precisely defined standards of care owed to each.

"This emphasis on categories and labels involves a high degree of formalism which experience has proved to be a fertile source of unrealistic distinctions, capricious results and all too many appeals on what should be questions of fact but are distorted into questions of law. In response to increasing dissatisfaction, drastic reform in England finally introduced a 'common duty' of reasonable care in favour of all lawful visitors alike.[2]

---

"[1]Enunciated by Willes J. in *Indermaur v. Dames* (1866) L.R. 1 C.P. 274 and *Gautret v. Edgerton* (1867) L.R. 2 C.P. 371.

"[2]Occupiers' Liability Act, 1957. See Street, chap. 10, sect. 2; Salmond, chap. 12; Odgers, [1957] Cam. L.J. 39; Payne, 21 Mod. L. Rev. 359."

[author's emphasis] Fleming, *The Law of Torts* 404, 3d ed. (1965).

To like effect, *see* Prosser, *Law of Torts* 351, 4th ed., Hornbook Series (1971), and 2 Harper and James, *The Law of Torts* 1430 et seq. (1956).

There is no indication whatsoever in the Reports that Congress intended that the land-based law to be applied was that of occupier and invitee. We regard as a premise, at least of the common law, that not only the existence but the nature of a duty arises out of some relationship of the parties; whatever the relationship between vessel and longshoreman may be, it is not that of occupier of <u>land</u> and invitee.[19]

---

[19]For the purposes of this case, we need not reach the issue of general maritime law applicable to matters within the admiralty and maritime jurisdiction versus the common law. *See* U.S. Const. Art III, § 2; *Southern Pacific Co. v. Jensen,* 244 U.S. 205 (1917); "The Lottawanna," 21 Wall. 558 (1874); *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625 (1959), where the court stated: "The issue must be decided in the

At the other end of the scale are those, including this plaintiff, who urge that we must apply maritime negligence law without any leavening by "land-based" concepts. At the extreme of this view is the position of Gilmore and Black,[20] who urge that the concept of negligence which has been developed in seamen's actions under the Jones Act should be applied. The basis of their argument seems to be:

> "* * * that it makes sense for the shipowner to owe the same standard of care to commercial invitees like repairmen and longshoremen that he owes to crew members, and that a unitary standard of care would greatly simplify the law of the new negligence action." Robertson, Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 7 J of Mar L & Comm 447, 449-50 (1976).

Robertson notes that *Benedict on Admiralty*[21] disagrees with Gilmore and Black as to application of the Jones Act "standard" but that *Benedict* does predict the emergence of a "thoroughgoing and healthy negligence action" based upon general maritime principles. *See also* n. 19, *ante,* and accompanying text.

Decision of post-1972 amendment cases solely under the general maritime negligence law completely untrammeled by land-based common law concepts would fly directly in the face of the Reports and is no more warranted than is the action of those courts which have proclaimed that the shipowner no longer

performance of the Court's function in declaring the general maritime law, free from inappropriate common-law concepts. * * * We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." pp. 630-32. It may well be in a case where necessary to do so this court or the United States Supreme Court will hold the last-quoted sentence to be the correct measure and nature of duty under the 1972 amendments.

[20] Gilmore and Black, *The Law of Admiralty,* 452-55, 2d ed. (1975).

[21] *Benedict on Admiralty,* 7th ed. Jhirad.

has any duty to furnish a safe place to work, thereby conveniently overlooking that which is plainly to be seen in the Reports. *See* the discussion of this aspect, *infra,* at page 503. We, therefore, reject that position urged by plaintiff.

The Third Circuit, in *Hurst v. Triad Shipping Co.,* 554 F2d 1237 (3d Cir 1977) suggests that the nature of the duty is better described in terms of 2 Restatement (Second) of Torts, § 414. Chapter 15, Restatement (Second) of Torts, is concerned with the liability of an employer of an independent contractor. Section 409 sets forth the so-called "general rule" that the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants. As indicated in comment *b,* however, the general rule is now primarily important only as a preamble to the catalog of its exceptions. The exceptions are contained in Sections 410-429, which make up the balance of Chapter 15. Sections 410 through 415 are exceptions based upon the employer's own conduct, while the exceptions in Sections 416 through 429 are based upon a theory of the employer's vicarious liability for the tortious conduct of the independent contractor or his servants.[22]

In *Hurst* the injured longshoremen urged that they were entitled to recover under the duty described in Section 414 on the theory that the shipowner had "ultimate control" over the stevedoring operations. Section 414 provides as follows:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others

---

[22]The federal district court in *Brown v. Ivarans Rederi A/S,* 545 F2d 854 (3d Cir 1976), had instructed the jury pursuant to Section 416. The Court of Appeals rightly observed that this was improper because of the injunction in the committee reports against holding the shipowner vicariously liable for negligence of the stevedore. We observe that even here the *statutory* language as such would permit recovery against the shipowner vicariously. This is one more reason Congress should again turn its attention to Section 905(b).

for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

The court rejected their contention on the bases: (1) that using the shipowner's ultimate control in order to create a duty of supervision would amount once again to the establishment of a nondelegable duty; (2) ultimate control over stevedoring operations is not the sort of control to which Section 414 is directed. For Section 414 to apply, the contractor must be controlled as to his methods of work or as to operative detail. The court then expressly approved the district court's analysis that Section 414 is part of the "federal common law" applicable to longshoreman suits against vessel owners under the 1972 amendments.[23]

Another court has recently considered the nature of the duty with some reference to Section 413, Restatement (Second) of Torts. In *Munoz v. Flota Merchante Grancolombiana, SA,* 553 F2d 837 (2d Cir 1977), the panel, speaking through Chief Judge Kaufman, held that the evidence was insufficient as a matter of law to make a question for the jury as to negligence of the shipowner. (The facts there are not particularly important for our discussion.) The court first stated:

"The shipowner's responsibility for maritime accidents cannot follow from mere invocation, without more, of the talismanic claim of 'negligence.' * * *" p. 839.

The court recognized that it had applied 343A in an earlier Second Circuit case[24] where it was an open and obvious dangerous condition. In *Munoz* the court found

---

[23] We believe the use of the term "federal common law" may be unfortunate. "There is at least superficial incongruity in [the committee reports] calling for both land-based law and federal uniformity, as the traditional source of a federally uniform body of law in these matters has been the general maritime law. There is, as such, no federal common law." Robertson, Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 7 J of Maritime L & C 447, 466 (April 1976). *But see Erie R. Co. v. Tompkins,* 304 US 64, 78 (1937): "There is no federal general common law." *See also Jacobson v. Tahoe Regional Planning Agency,* 558 F2d 928, 937 (1977).

[24] *Napoli v. Hellenic Lines, Ltd.,* 536 F2d 505 (2d Cir 1976).

that the shipowner had relinquished control of the hold, then in a reasonably safe condition, to an experienced stevedore, that the stevedore's negligence had created a <u>latent</u> dangerous condition which was unknown to the owner,[24a] and that in such circumstances there was no jury case without risking return to the concept of liability without fault for shipowners, which Congress had rejected. The court stressed the fact that the work entrusted to the stevedore was "within its normal competence," indicating that by reason of that fact Section 413, Restatement (Second) of Torts was inapplicable. We might well question that, but it is unnecessary for our purposes to travel that pathway.

Inherent in the defendant's choice not to authorize the use of bull winches is an exercise of <u>control of the method of work,</u> if not indeed control as to operative detail. Since, as we have already pointed out, the jury could have found that dead-ending was the only feasible alternative to the use of bull winches, it may also be inferred that dead-ending was "required" as a concomitant of defendant's injunction against using bull winches. Thus, the defendant also exercised in this respect control as to the method of work, if not the operative detail.[25]

In *Brown v. Ivarans Rederi A/S, supra,* the panel of the Third Circuit discussed some approaches to the analysis of the nature of the duty owed under Section 905(b) and concluded the opinion with a suggestion to

---

[24a] *Compare* this with the evidence from which the jury could have found in the case at bar that the defendant's representative, the supercargo, both knew of the condition created by the method of stow and admitted he recognized its danger to the longshoremen.

[25] We recognize this is not the same control over operative detail as existed in *Butler v. O/Y Finnlines, Ltd.,* 537 F2d 1205 (4th Cir 1976), where the vessel's third mate was actually in the hatch supervising stowage to the extent of countermanding the manner in which a counterweight was to be stowed. Nevertheless, there was evidence as pointed out from which the jury could find that defendant controlled Portland as to Portland's methods of work in the two respects submitted to the jury. *See also* 2 Restatement (Second) of Torts § 414.

[ 501 ]

the district court for retrial as to "the standard of care."[26] The *Brown* court concluded:

> "* * * It would appear that the principles of the law of negligence, as adopted in the admiralty field during the history of our country, are to form the basis of any recovery against shipowners insofar as such principles are not inconsistent with § 905(b)." 545 F2d 863.

The utility of the suggestion is questionable, since what is consistent with § 905(b) is the very object of the inquiry.

Since we predict that the United States Supreme Court will not in the relatively near future go so far as is suggested by Professor Ehrenzweig in *Negligence Without Fault* (1951), and as yet has not adopted the thoroughgoing and healthy negligence action based upon general maritime principles predicted by *Benedict* (*see* note 21, *ante,* and accompanying text), we suggest the nature of the duty might well be that proposed in *Heaven v. Pender,* 11 Q.B.D. 503, 509 (1883):

> "Whenever one person is placed by circumstances in such a position in regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances, he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."

Surely under that rule it would be a question for the jury as to whether negligence of the defendant was a cause of Shepler's death in this case. We need not adopt that rule, however, for disposition of this case.

Under any duty thus far suggested by federal decisions, if the employer of an independent contractor dictates a particular method for performing the contracted work which is unreasonably dangerous to the

---

[26]We do not wish to belabor the point unnecessarily, but we respectfully disagree that it is the standard of care as distinguished from the nature of the duty with which the courts must deal in applying § 905(b).

workmen of the independent contractor, taking into consideration the possible alternative methods, he is responsible in damages for injuries caused to such workmen thereby. This is a duty to the employes of an independent contractor which is universally imposed upon the employer of such a contractor in any context, whether on land or at sea, and about which there can be no real argument. See Section 410 of Restatement (Second) of Torts, which provides:

> "The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself."

Comment *b,* which concerns the extent of the rule, has the following to say:

> "This Section deals only with the liability of an employer who does not intend that the contractor shall cause physical harm to any other person, but who either employs a contractor to do work which, no matter how carefully done, involves an unreasonable risk of physical harm to others to whom he owes a duty to exercise care, or who employs a contractor to do work which could be safely done but for the fact that he directs the contractor to do it in a manner involving such risk. The liability is based upon the fact that the employer has been negligent in directing his contractor to do work which is dangerous in itself or in the manner in which it is done. Therefore, the employer is subject to liability, under the rule stated in this Section, for only such physical harm as is caused by the dangerous character of the work or the dangerous manner in which it is directed to be done. He is not subject to liability for any harm caused by some improper method which the contractor, without any direction of his employer, adopts in doing the work."

We do not hold that the duty of the owner or the charterer of a vessel is limited to that set forth in Section 410, but do hold that his duty must go at least that far. That is all that is necessary for a decision in this case.

Defendant also assigns as error the court's instruct-

ing the jury that defendant owed a duty to provide a safe place to work. In this respect the complained-of portion of the court's charge is as follows:

> "When a charterer exercises control in whole or in part for stowing cargo, such a charterer has the duty to provide persons employed aboard a vessel with a reasonably safe place to work, in this case, within the allegations of negligence, that I am going to submit to you within those two allegations.
> "* * * * *
>
> "If such negligence as alleged is proven to you by the plaintiff, this would render the charterer Weyerhaeuser liable for damages sustained by a workman injured or killed as a result of the charterer's failure to provide a safe place to work."

Apparently the "exception" to this charge was taken in the nature of a colloquy between defense counsel and the court in a preinstruction conference:

> "THE COURT: * * * Any other instructions, exceptions other than what we have previously noted?
> "MR. DAIGLE: Just briefly, your Honor. No. 4, your Honor, reads:
> " 'If such negligence as alleged is proven to you by plaintiff, this would render the charterer liable for damages sustained by a workman injured or killed as a result of the charterer's failure to provide a safe place to work.'
> "I don't think a charterer has the duty to provide a safe place to work. With reference to the previous Instruction No. 3, it says:
> " 'When a charterer exercises control in whole or in part for stowing cargo, such charterer has a duty to provide persons employed aboard a vessel with a reasonably safe place to work.'
> "THE COURT: And I have added in within the allegations of negligence.
> "MR. DAIGLE: Yes, sir. My point is that a charterer, in this case Weyerhaeuser, may very well—I don't say they do, but assuming they exercise control over the loading operation for the first hour of the first day—the way that instruction reads is that if Weyerhaeuser exercised control on the first part of the job, then they are liable for something that happened three days later

after the first hour that complete control was turned over to the stevedore company.

"THE COURT: I tied that up. I understand. You have the exception. I did tie that up by saying it has to be there. The control aspects in those two aspects has to be the cause of the injury. That cures that. As I say, the reason I've been doing this I might say about 95 percent of the lawyers prefer they can say now the Judge will tell you this, I want to be sure and call your attention to the facts of this."

Immediately following the conclusion of the court's complete charge to the jury, counsel for the respective parties made oral argument. Insofar as the transcript reflects, no exceptions were taken to the charge given either before or after the oral argument which followed the charge to the jury. Later the jury asked for reinstruction on certain points concerning the defendant maintaining any control or participating in the control of the loading of the vessel, and requested a restatement of instructions regarding the legal responsibilities of the men in the hold. In part, the court reinstructed the jury as follows:

"This is all true unless the charterer undertakes and exercises control in whole or in any material part for a particular operation and in this case it is a question of fact if the charterer Weyerhaeuser undertook to participate in the control of a particular loading style for this ship; that is, to load it in a particular manner.

"And it is a question of fact whether such loading would require either a bull winch operation of [sic] dead-ending of logs.

"When a charterer exercises control in whole or in part for stowing cargo, such a charterer has the duty to provide persons employed aboard a vessel with a reasonably safe place to work, in this case, within the allegations of negligence. This means it is the duty of such a charterer to use reasonable care in order to avoid injury to a workman aboard the vessel in any situation in which it can reasonably be anticipated that a failure to use such care might result in such injury.

"* * * * *

"If such negligence as alleged is proven to you by

[ 505 ]

plaintiff, this would render the charterer liable for damages sustained by a workman injured or killed as a result of the charterer's failure to provide a safe place to work."

To the complained-of portion of the charge, on reinstruction, defendant in its brief sets forth its "exception" as follows:

"The Court erroneously reinstructed the jury a second time on the same subject as revealed in the affidavit of Paul N. Daigle, correcting and supplementing the record on appeal:

" 'I, PAUL N. DAIGLE, being first duly sworn, depose and say:

" 'Approximately one hour after the jury requested to be reinstructed (Tr. pag. 611) I received a telephone call from Judge Jones who stated that the jury had requested to be reinstructed on the same matters set forth in their original request. At that point I stated to Judge Jones I had no objections to his submitting the instructions in written form to the jury and I assume that he did so.' (Trial court file)"

We have grave reservations concerning the sufficiency of the "exceptions" here claimed. We believe it the better practice to take exceptions to instructions as given at an appropriate time after the charge rather than prior thereto. Next, we doubt that the "exception" purportedly taken by affidavit is any exception at all. In the interest of fairness, however, we shall consider these exceptions as if properly taken, assuming that the same exception as was taken to the instruction before the charge was given has been taken to the reinstructions.

The exception actually challenges the instruction on two grounds, the first being that the defendant had no duty to provide a safe place to work and the second being that the defendant had no duty to provide a safe place to work after relinquishing control of the vessel to the stevedore.

■ Whether the shipowner has a duty to provide a safe place to work has been somewhat puzzling to the

federal courts. For instance, in *Crowshaw v. Koninklijke Nedlloyd, B. V. Rijswijk,* 398 F. Supp 1224 (D Or 1975), an early case arising after the 1972 amendments, the court at page 1229 asserts: "The shipowner does not owe the longshoreman a duty to provide him with a safe place to work." Compare this statement with language on page 1230: "Shipowners retain the initial obligation to provide invitees with a reasonably safe place to work." We believe that a fair construction of the Reports as a whole not only requires the shipowner to provide a reasonably safe place to work at the time the master stevedore and his employes board the vessel, but further to exercise ordinary care to maintain a reasonably safe place to work. Otherwise, the following language from the Reports has no meaning whatsoever:

> "Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

> "So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 [33 USC § 905] would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances."

The duty thus embodied under the Reports is no more than that of any land-based person; namely, to provide a safe place to work for an independent contractor and his employes. On the other hand, it is clear from the Reports as a whole that the shipowner may delegate the duty to provide a safe place to work in all instances in which a land-based person might do so and, there-

[ 507 ]

fore, escape liability imposed vicariously although still being liable for his own negligence. Applying that construction to the exception here taken, we find the first ground of the exception to be erroneous and the second not to be valid because there was evidence from which the jury could find that the defendant was exercising control over the method of the work and the instruction given by the court conditions the defendant's duty to provide a safe place to work upon a finding by the jury that the defendant was exercising such control. Furthermore, the obligation was limited by the court's charge to the two particulars of negligence submitted to the jury.

Defendant's assignment of error No. 1 follows:

"The Circuit Court erred in refusing to rule as a matter of law that Plaintiff failed to prove liability against Defendant Weyerhaeuser Company, and in improperly instructing the jury in regard to Defendant Weyerhaeuser's liability."

This assignment of error was then broken down into 12 subdivisions. Apparently defendant itself believed that all of these 12 subdivisions were subsumed in one general question, for in stating the issues presented on appeal defendant set forth one general question to cover all 12 subdivisions:

"(A) Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, does a voyage charterer who hires an independent expert stevedore to conduct loading operations owe any responsibility to provide a safe place to work or to warn[27] of open and obvious conditions to a longshoreman-stevedore's employee injured or killed during the loading?"

Our prior discussion has disposed of the first five subdivisions. The other seven are concerned with failure to give certain instructions requested by defendant. We have examined each of these and find

---

[27] Plaintiff did not charge defendant with a failure to warn Shepler of the condition in the hold, and our discussion of the nature of the duty under the evidence of this case shows that the giving of a warning does not in and of itself satisfy the duty owed.

[ 508 ]

that there was no error either because they were incomplete statements of the law, were erroneous under the nature of the duty we have concluded was owed, or were adequately covered in other portions of the court's charge.

### OFFSET FOR STEVEDORE'S NEGLIGENCE

■ Defendant urges that should we uphold the verdict we should not uphold the judgment against defendant for more than 28% of the total damages awarded, on the basis that the jury found defendant to be only 28% negligent. Defendant would have us apply what has come to be known as the equitable credit doctrine. A fair exposition of the doctrine is as follows:

"1. Plaintiff retains his no-fault compensation benefits in full.

"2. His recovery against the shipowner is reduced by the percentage of his own negligence.

"3. The shipowner's liability is reduced by the percentage of the stevedore's negligence, as well as that of the plaintiff.

"4. The stevedore is not liable for damages because the Act limits his exposure to compensation payments. Furthermore, he may enforce his equitable lien against plaintiff's recovery from the shipowner. Because his own negligence has reduced plaintiff's recovery by [a percentage], however, his lien is diminished by the amount that percentage constitutes of the total judgment." *Crowshaw v. Koninklijke Nedlloyd, B. V. Rijswijk, supra* at 1233.

Application of the doctrine does have some appeal, but we decline to apply it in this case for the following reasons: (1) It appears to us to be exactly contrary to the Reports and would permit the shipowner in effect to obtain indemnity indirectly and to reduce the stevedore's lien against the compensation paid under the Act; (2) A majority of the federal courts of appeal which have considered the question have rejected application of the doctrine. Included in these is the Ninth Circuit. *See Shellman v. United States Lines, Inc.,* 528 F2d 675 (9th Cir 1975), *cert den* 96 S Ct 1668

(1976). In the Fourth Circuit, which did apply the doctrine, there was a vigorous and able dissent by one of the three judges of the panel which heard the case. *See* dissenting opinion of Circuit Judge Hall, *Edmonds v. Compagnie Generale Transatlantique,* 558 F2d 186 (4th Cir 1977); (3) On the face of it, it seems unfair to have the stevedore's percentage of negligence determined in a case in which the stevedore is not a party and has no power to control any portion of the presentation of evidence upon which the trier of fact assesses the stevedore's percentage of negligence or fault; (4) There is no assignment of error before us as to any ruling made by the trial judge upon this point. Insofar as we can tell from the record, the trial judge was not asked to do what defendant would now have this court do.

## *EVIDENCE AND THE FINANCIAL INTEREST OF PORTLAND*

■ Defendant's second assignment of error is as follows:

> "The Circuit Court erred in preventing defendant Weyerhaeuser from demonstrating the bias and financial interest of Portland Stevedoring Company in the outcome of the present litigation."

Plaintiff called certain witnesses who at the time of Shepler's fall were regular employes of Portland. The trial judge prevented defendant, upon cross-examination of these witnesses, from showing that Portland had a financial interest in the outcome of the case as it pertained to Portland's lien against the recovery for compensation benefits paid to plaintiff. Plaintiff answers this assignment by stating there was no offer of proof as to what these witnesses would have said, and this court is therefore unable to determine what evidence might have been elicited and consequently cannot determine, even if there were error, whether it was prejudicial. It is doubtful whether an offer of proof is required where an objection is sustained upon cross-examination. *See Arthur v. Parish,* 150 Or 582, 47 P2d 682 (1935); *Beemer v. Lenske,* 241

Or 47, 402 P2d 90 (1965); and *Stillwell v. S.I.A.C.,* 243 Or 158, 411 P2d 1015 (1966). Defendant did make an offer of proof by an attorney for Portland as to Portland's financial interest in any recovery by plaintiff. On the other hand, there is no offer of proof that the witnesses who had been employed by Portland would themselves be financially benefited by any recovery or failure of recovery in the case. The offer of proof by the attorney's evidence did not go to this point.

Although it is not applicable to this case, our own Workmen's Compensation Act expresses a legislative policy that in a third-party action the jury is not to be made aware that the plaintiff is entitled to workmen's compensation benefits. Furthermore, in *Strandholm v. General Const. Co.,* 235 Or 145, 382 P2d 843 (1963), we affirmed the trial court in granting a new trial after a defense verdict where the fact that plaintiff was entitled to benefits under LHWCA was deliberately disclosed to the jury by the defendant.

We are really dealing with a policy question concerning the collateral source doctrine, and this court has quite recently carefully considered the question. In *Reinan v. Pacific Motor Trucking Co.,* 270 Or 208, 527 P2d 256 (1974), we noted:

> "* * * The salutary policy underlying the collateral source rule is simply that if an injured party received some compensation from a source wholly independent of the tortfeasor, such compensation should not be deducted from what he might otherwise recover from the tortfeasor. The evidentiary consequence of this rule is that proof of such payments is generally regarded as inadmissible *in view of its potential misuse by the jury.*" 270 Or at 213. (emphasis added)

We further noted: "[T]hat the likelihood of misuse by the jury clearly outweighs the value of this type of evidence and the likelihood of an impermissible prejudicial impact on the jury's deliberations cannot be discounted." As a policy decision, we therefore continued our traditional adherence to the strict exclu-

sionary rule. We decline to reexamine that decision on the record in this case.

Affirmed.