## BESMEHN,
*Respondent,*

*v.*

## PACIFIC COAST SHIPPING COMPANY MONROVIA,
*Defendant,*
## SCHNITZER STEEL PRODUCTS CO.,
*Appellant.*

## SCHNITZER STEEL PRODUCTS CO.,
*Third Party Plaintiff - Appellant,*

*v.*

## BRADY-HAMILTON STEVEDORE CO.,
*Third Party Defendant - Respondent.*

(No. A7708-11770, CA 14091)

632 P2d 454

Alex L. Parks, Portland, argued the cause for appellant. With him on the briefs were Roger J. Leo and Parks, Montague, Allen & Greif, Portland.

Raymond J. Conboy, Portland, argued the cause for respondent Besmehn. With him on the brief were Gary L. Kahn and Pozzi, Wilson, Atchison, Kahn & O'Leary, Portland.

John Dudrey, Portland, waived appearance for respondent Brady-Hamilton Stevedore Co.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Plaintiff Besmehn is a longshoreman who was injured while unloading steel from the defendant Pacific Coast Shipping Company's ship, the *Pacmonarch.* Defendant-appellant Schnitzer Steel Products Co. (Schnitzer) is the owner of the dock at which the vessel was berthed at the time and is the consignee of the cargo being unloaded. Third party defendant Brady-Hamilton Stevedore Company (Brady) was hired by Pacific Coast to unload the *Pacmonarch.* It was plaintiff's employer at the time of the accident. Plaintiff sued Pacific Coast and Schnitzer for negligence, claiming that the defendants were negligent in failing to use certain dockside cranes, as opposed to cranes located on the ship, for unloading the cargo. Schnitzer filed a third-party complaint against Brady, claiming that if Schnitzer was liable to plaintiff, the liability was caused by Brady's negligence. The jury found that the defendant Pacific Coast was not at fault, that Schnitzer was 35 percent at fault, that Brady was 51 percent at fault and that plaintiff was 14 percent negligent. Judgment was entered against defendant Schnitzer for $129,000.[1] Schnitzer appeals; we affirm.

The only parties to the appeal are plaintiff Besmehn and defendant Schnitzer. Schnitzer claims that the trial court erred in denying its motions for an involuntary nonsuit, for a directed verdict and for judgment notwithstanding the verdict because Schnitzer, in its capacity as owner of the dock and consignee of the cargo, owed no duty to plaintiff to provide dockside cranes for discharge of the cargo. Alternatively, Schnitzer contends that, even if it had such a duty, there is no evidence that it was in breach of

---

[1] Under the federal Longshoremen's and Harbor Workers' Compensation Act, plaintiff's employer, Brady-Hamilton, is liable for workers' compensation benefits only. *See* 33 USC § 905. Defendant Schnitzer does not challenge the fact that the amount of the judgment entered against it was reduced solely by plaintiff's contributory negligence and not by Brady-Hamilton's negligence. Cases which have arisen under the federal Act have held that, where both the stevedore and the vessel are found to be negligent, the judgment against the vessel should not be reduced by the negligence of the stevedore. *See Shepler v. Weyerhaeuser Company,* 279 Or 477, 509-510, 569 P2d 1040 (1977). Defendant does not claim that a different rule should apply in this case on the theory that it is not a vessel and not within the terms of the federal Act.

that duty in this case. In considering defendant's contention, "we view the evidence in the light most favorable to the prevailing party and give that party the benefit of all reasonable inferences that may be drawn from the evidence." *Davis v. Portland General Electric Co.,* 286 Or 195, 197, 593 P2d 1135 (1979). The relevant facts are as follows:

Pacific Coast Shipping Company (Pacific Coast) entered into a contract with Schnitzer to carry steel for Schnitzer from Japan to Portland. According to the agreement, the vessel was on "berth terms." This means that the *Pacmonarch* had the responsibility both to load and unload the cargo. Through its management agent in Portland, Lasco Shipping, Pacific Coast hired Brady, an independent contractor, to unload the cargo from the *Pacmonarch.* Plaintiff was one of the longshoremen Brady hired to do the work. Schnitzer owned the cargo carried by the *Pacmonarch* and unloaded by Brady's employes. Schnitzer also owned and controlled the dock where the *Pacmonarch* was berthed and the "whirly" (dockside) cranes located on the dock.

The *Pacmonarch* is equipped with a type of crane known as a Munck crane. It consists of a metal beam suspended by two legs which are mounted on tracks running the length of the ship. The beam itself runs across the ship. Attached to the beam is a metal structure known as a head block. The head block moves across the beam from a point over the hatch or hold, where the ship's cargo is located, to a point over the dock. An operator sits in a control bubble on the underside of the head block and from that point controls the lifting gear, also located on the block. The lifting gear is lowered into the hold, picks up the cargo and then carries the cargo over and onto the dock.

On the day in question, plaintiff and another longshoreman were in one of the *Pacmonarch's* holds unloading steel pipe. The pipe, which was 20 feet long and four inches in diameter, was being hoisted out in bundles of approximately 10 to 12 pipes. The usual procedure for unloading the bundles of pipe in such cases is described as follows: Two men stand at opposite ends of the pipe. As the crane's lifting gear is lowered into the hold, each man grabs one of the slings attached to the lifting gear and wraps the

sling around his end of the bundle of pipe. Once the slings are in place, the operator of the crane picks the load up slowly to set the slings tight. The men in the hold then move out of the way and the load is hoisted out.

The slings and the load form a triangle with the hook of the crane's lifting gear at the apex, the bundle of pipe as the base (which may extend outside the slings) and the slings as the sides. On the day of the injury, the fourth load of pipe was ready to be lifted from the hold in which plaintiff was working. As the operator started to move the load, the sling on plaintiff's side of the bundle slipped toward the other end of the bundle, causing the ends of the pipes nearest plaintiff to flare out and hit him. The plaintiff was knocked down by the blow and suffered a fractured leg.

The safety and use of the Munck crane to unload bundles of steel pipe, as compared to the "whirly" crane, was subject to testimony at trial. Because of the design of the Munck crane, the amount of "drift" or clearance the crane has when lifting cargo is only about 15 to 20 feet. The "drift" is the distance between the point at which the cargo comes out of the hatch and the greatest height to which it can be lifted by the crane. As a result of this limited clearance when a Munck crane is used, the slings that are used are short and a severe angle of attachment of the slings to the load is created. Thus, the possibility exists that the slings can slide into the middle of the load. In contrast to the Munck crane, the dockside crane has unlimited clearance. Dockside cranes run on tracks located on the dock and alongside the vessel. They allow longer slings and a device known as a spreader bar to be used when lifting bundles of pipe. The severe angle created when the Munck crane and short slings are used is eliminated and the spreader bar keeps the slings separated so they cannot slip together.

The Brady employes who were on the job the day plaintiff was injured testified that they were aware of the dangers of the Munck crane and felt that it would have been safer to use the dockside cranes. Walter Smith, Brady's safety engineer, testified that he discussed the problems and hazards of using the Munck crane with the

longshoremen's union business manager and that he and the manager then discussed the matter with Herbert Fear, the person responsible for supervising the loading and unloading activities on the dock for Schnitzer. Smith stated that he told Fear that using the Munck cranes to unload the steel was unsafe and that he, Smith, was concerned about someone getting hurt. Smith indicated that he asked Fear to discontinue using the Munck crane and to allow use of the dockside cranes. According to Smith, Fear agreed that the dockside cranes would be better, but he declined to switch because use of the dockside cranes would make it difficult to use the Munck cranes in the ship's other hatches later and because it was company policy to use the cranes on the ship. Jack Grohs, the walking boss (foreman) on duty that day for Brady, testified that he also asked Fear if the dockside cranes could be used, but Fear refused, indicating that the company wanted the ship's cranes to be used.

Fear testified that he is a superintendent in charge of scrap iron loading and steel discharging for Schnitzer. On the day of the accident, he was on the dock to assist the stevedore, Brady, in discharging the steel. Fear admitted that he talked with Smith and the business manager and that they asked to use the dockside cranes. Fear stated that they did not discuss the safety factors but that Smith and the manager merely sought his opinion on whether the dockside cranes could be used. Fear testified that he told them that it would be impossible to use the cranes, given the number of gangs working the ship, but denied that he flatly refused use of them. According to Fear, the stevedore company itself makes the decision and request on whether to use the dockside cranes. He then indicated that, had Smith or Grohs asked to use the cranes, he would have made the necessary arrangements unless there was some reason for not allowing them to use the cranes.

In 1973, Schnitzer and Brady had entered into a contract whereby Brady was given the exclusive right to handle all cargoes of vessels owned, chartered, controlled or managed by Schnitzer. The contract was still in effect at the time of the accident. According to the terms of the agreement, Schnitzer was to supply all gear and equipment

necessary for the discharging or handling of cargo, including dock whirly cranes. A memo instructing Brady superintendents on the effect of the contract provides:

*"As for operations, manning gear, etc., on these vessels, we'll take all of our instructions from Schnitzer personnel.* This relationship does not supersede any technical recommendations that we may feel would contribute to the efficiency of these operations. \* \* \* Materials and equipment will be furnished by Schnitzer. If additional materials and/or equipment are required by one of the above men, we'll request our gear logger to do the same. All materials and equipment must be signed for by a Schnitzer man. \* \* \* After each vessel completes, Mr. Herb Fear, Mr. Olin Black, or Mr. John Westfall will review and initial all timesheets." (Emphasis supplied.)

Schnitzer did not own, charter, control or manage the *Pacmonarch.*[2] Therefore, the contract between Schnitzer and Brady did not, by its terms, apply to the unloading of the *Pacmonarch;* the agreement to unload in this case was between Pacific Coast and Brady. However, Fear testified that the terms of the agreement emphasized above did apply to the job in question. He testified further that he initialed or endorsed the timesheets of the men who worked on unloading the *Pacmonarch.* Smith and Grohs did not distinguish this job from any other job they did involving Schnitzer; both men testified that Schnitzer employes supervised the loading and unloading of the vessel. They stated that Mr. Fear told them how and where to work and what equipment to use.

■■ Defendant claims that it had no duty to provide the dockside crane for plaintiff's use under any theory of law, maritime or otherwise. Because this case involves an injury to a longshoreman while in the process of unloading a vessel, the parties have discussed at length the body of federal law which has developed in this area.[3] However, we

---

[2] Lasco Shipping, Pacific Coast and Schnitzer have common officers and directors. They are, however, separate legal entities. Plaintiff made some attempt at trial to demonstrate the interrelationship between the company's and Fear's control by the ship's owner, but this case proceeds on the theory that the companies are separate entities and that Fear did not represent the ship when directing the stevedore operations.

[3] There is no question but that this case involves a maritime tort within the admiralty jurisdiction of the federal courts. The activity involved, *viz.,* unloading the ship's cargo, is a traditional maritime activity and took place in navigable

do not find this to be a case governed by the Longshore-men's and Harbor Worker's Compensation Act, 33 USC § 901, *et seq.* Defendant Schnitzer is not a vessel within the meaning of that statute. *See* 33 USC §§ 902(21)[4], 905(b).[5] Neither did it possess the ship or have any responsibility to maintain the ship and its equipment in a safe condition. The standards discussed by the parties pertain only to the duty of a vessel and are not applicable to this case. More-over, we find no duty as a general principle of federal maritime law owed by a dockowner, by virtue of its status as a dockowner, to a stevedore in a case such as the one before us. We do not believe such a claim of duty is made by the plaintiff. If a duty exists in this case, it is a particular duty which exists by virtue of the relationship of these particular parties and the particular circumstances of this case.

■        We conclude that, given the facts before us, Schnit-zer had a duty to this plaintiff. This is true whether we

---

waters. *See Executive Jet Aviation v. Cleveland,* 409 US 249, 93 S Ct 493, 34 L Ed 2d 454 (1972); *Edynak v. Atlantic Shipping, Inc., CIE. Chambon,* 562 F2d 215 (3d Cir 1977). Such actions may be brought in state courts under the "savings to suitors" clause. *See* 28 USC § 1333.

[4] 33 USC § 902(21) provides:

"The term vessel means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer or crew member."

[5] 33 USC § 905(b) provides:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

apply the federal standard of review or Oregon's.[6] Fear testified that he was on the docks the day of plaintiff's injury to assist Brady in unloading the steel. Fear testified further that the terms of the Schnitzer-Brady contract did apply to the discharge of the *Pacmonarch's* cargo and that he, as provided by the agreement between Schnitzer and Brady, initialed the timesheets of Brady's employes. The evidence also indicates that Brady's employes believed that Fear, as Schnitzer's agent, made the final decision as to whether the dockside cranes were to be used.

These facts establish a duty on defendant Schnitzer's part to provide the dockside cranes for plaintiff's and the other Brady employes' use. The duty arose, not because Schnitzer owned the dock and the cargo, but because Schnitzer had control over the conduct of Brady's operation. *See Shepler v. Weyerhaeuser Company, supra,* 279 Or at 501. This control was assumed by treating the terms of the contract which specifically provided for control to be exercised when Schnitzer owned, chartered or controlled the ship as if it were applicable to the unloading of the *Pacmonarch,* even though the *Pacmonarch* was not owned, chartered or controlled by Schnitzer. There is no question but that Schnitzer owned the dockside cranes and that it could have provided them, through its agent Fear, to Brady for its use. It is true that Brady was also responsible for ensuring safe working conditions for its employes[7] and that Brady's employes knew the dangers involved in using the Munck cranes. However, that awareness and duty on Brady's part did not relieve Schnitzer of its duty.[8] Given the facts before us, we find that Schnitzer had a duty to provide the dockside cranes.

---

[6] If we were to apply the federal standard, we would have to determine if the record is "critically deficient of the minimum quantum of evidence from which a jury might reasonably afford relief." *Marant v. Farrell Lines, Inc.,* 550 F2d 142 (3d Cir 1977). If we apply the standard which we ordinarily exercise on appeal in actions at law, our review is more limited. "Since the verdict was for plaintiff, we could not find error in these respects unless we could affirmatively say there is no evidence to support the verdict." *Shepler v. Weyerhaeuser Company, supra,* 279 Or at 484.

[7] The stevedore has a statutory duty under federal law to provide a safe place to work. *See* 33 USC § 941, 29 CFR § 1918.1 *et seq.*

[8] As noted, the jury found Brady to be more at fault than Schnitzer.

■ Defendant's second claim is that, even assuming it did owe a duty to provide the cranes, there is no evidence that it breached this duty.[9] Defendant contends that there was a total failure of proof that it failed to extend the use of the dockside cranes upon clear demand by Brady's supervisor or the longshoremen union's business agent. The evidence on whether a demand was made by Brady employes and whether or not Fear refused to allow them to use the dockside cranes was in conflict. The conflict in the witnesses' testimony was for the jury to resolve. Our only task is to determine if there was sufficient evidence to submit the case to the jury. The facts set out in detail above indicate that plaintiff presented evidence of both a request to use the cranes and a denial of that request.

We conclude that defendant's motions for involuntary nonsuit, directed verdict and judgment notwithstanding the verdict were properly denied by the trial court.

Affirmed.

---

[9] To establish actionable negligence, a plaintiff must prove that the defendant owed him a duty, that the defendant was in breach of this duty and that the breach was the cause, in fact, of some legally cognizable damage to plaintiff. *Brennen v. City of Eugene,* 285 Or 401, 405, 591 P2d 719 (1978); *Oksenholt v. Lederle Laboratories,* 51 Or App 419, 625 P2d 1357 (1980). Defendant does not claim that the breach of its duty to provide the dockside cranes was not the cause of plaintiff's injury or question the damage claimed by plaintiff.