Submitted August 29, 19, on briefs and oral argument
previously held June 3, 1980, reversed and remanded September 22, 1981

# RAGNONE,
*Petitioner,*

*v.*

# PORTLAND SCHOOL DISTRICT NO. 1J,
*Respondent.*

(No. A7809-14371, CA 17974, SC 27257)

633 P2d 1287

Elden M. Rosenthal, P.C., Portland, argued and filed the briefs for petitioner.

James N. Westwood, Portland, argued and filed a brief for respondent. With him on the brief were William B. Crow, and Miller, Anderson, Nash, Yerke & Wiener, Portland.

Before Denecke, Chief Justice, and Tongue, Howell,** Lent, Linde, and Peterson, Justices.

PETERSON, J.

Lent, J., concurring.

** Howell, J., retired November 30, 1980.

## PETERSON, J.

This case concerns the liability of a school district, as an occupier of premises, for injuries to a licensee arising from the activities of school children engaged in a game in the defendant's gymnasium. Plaintiff had verdict and judgment, but upon motion of the defendant, the trial court eventually entered judgment for the defendant notwithstanding the verdict.[1] The Court of Appeals affirmed, *Ragnone v. Portland Sch. Dist. No. 1J*, 44 Or App 347, 605 P2d 1217 (1980). We allowed review, ORS 2.520, primarily to consider whether the nature of the duty of a land occupier should continue to depend upon the status of the entrant as invitee or licensee.

### 1. The facts

Plaintiff, a 61-year-old woman, had been employed as a cafeteria worker at Sellwood Middle School in Portland for several years and was on a medical leave of absence following major surgery. She was invited to attend, and did attend, a birthday party for the cafeteria manager at the school. After the party, the cafeteria manager was summoned to the school office. Plaintiff accompanied her, taking the route "we always took" across a gymnasium floor adjacent to the kitchen.

When the cafeteria manager had finished her business in the school office, the two women started to return to the kitchen to pick up their coats and purses. They used the same route they had taken previously, but on the return trip the gymnasium was being used by a group of students playing bench ball, a game of elimination where students try to hit one another below the shoulders with the ball. The participants were seventh and eighth graders. The teacher responsible for supervision of the students was not present.

Before traversing the gym floor on the return trip, the cafeteria manager called out to the students asking that they stand still and discontinue the game until the women reached the kitchen. When they were approximately two-thirds of the way across the gymnasium, one or two

---

[1] For the procedural course of this case, see footnote 1 of the concurring opinion.

of the students bumped into the plaintiff, knocking her to the floor whereupon her hip was broken.

Evidence was presented at trial that teachers were instructed not to leave classes unsupervised. The defendant's gym instructor testified that it was not appropriate for an adult supervising the gym class to leave the gym floor during the progress of a game. In addition, the defendant's regulations provided that students were not to be left unsupervised. The evidence is uncontroverted that plaintiff's injury occurred when she was knocked down by a student in an unsupervised class. Evidence was introduced that such occasions as the one attended by plaintiff were common at the school and condoned by the school administration, and that plaintiff was specifically invited to attend the event. From this evidence it was permissible for the jury to conclude that failure to supervise a physically active gym class was conduct creating an unreasonable risk of injury to plaintiff. Even so, both the trial court and the Court of Appeals held, as a matter of law, that the plaintiff was not entitled to recover. We therefore turn to an analysis of the reasoning of the trial court and Court of Appeals.

## 2. The reasoning of the trial court and the Court of Appeals

The plaintiff's second amended complaint contained several allegations of negligence, only two of which were submitted to the jury. Those charges of negligence were:

"In failing to maintain proper control and order over the students in said gym class; * * *

In failing to provide proper supervision of said gym class."

The trial court, in granting the defendant's motion for judgment notwithstanding the verdict, stated, "There was no active negligence committed by the defendant or its agents in this case. * * *" The Court of Appeals affirmed for essentially the same reason, saying:

"A social guest is a licensee. The defendant had a duty not to injure the plaintiff by affirmative or active negligence. *Blystone v. Kiesel,* 247 Or 528, 431 P2d 262 (1967) (mother-in-law visiting on Mother's Day); *Fleck v. Nickerson,* 239 Or 641, 399 P2d 353 (1965) (mother visiting on son's birthday); *Baer v. Van Huffell,* 225 Or 30, 356 P2d

1069 (1960); *Burch v. Peterson,* 207 Or 232, 295 P2d 868 (1956) (friend to play bridge); *McHenry v. Howells,* 201 Or 697, 272 P2d 210 (1954) (mother visiting daughter).

"The allegations of negligence in the above quoted specifications #2 and #4 of the plaintiff's second amended complaint, 'failing to maintain proper control', and 'failing to provide proper supervision,' *are allegations of passive negligence as opposed to affirmative negligence. They allege omissions by the defendant.*

\* \* \* \* \*.

In this case the seventh or eighth grade boys who 'bumped' into the plaintiff may have engaged in affirmative activity, but those are not the acts of negligence alleged in the second amended complaint.

The plaintiff's proof in support of specifications #2 and #4 did not tend to prove any negligence beyond failure to maintain proper control and failure to provide proper supervision." (Emphasis added.) *Ragnone v. Portland School District No. 1J,* 44 Or App 347, 352, 605 P2d 1217 (1980).

### 3. "Active" versus "passive" negligence—a misnomer when applied to the activities of an occupier

■■ The rule in Oregon, long established and fairly well understood and applied (with one exception, which is discussed below), is that an occupier of land has these duties to licensees:

1. As to conditions of the land, the occupier is liable for injuries arising from the occupier's willful or wanton act, and for that gross negligence which is equivalent to willfulness or wantonness." *Elliott v. Rogers Construction,* 257 Or 421, 431, 479 P2d 753 (1971). In addition, the occupier must warn of any pitfall or trap known[2] to the occupier which might cause injury to the licensee notwithstanding the use of reasonable care by the licensee. *Blystone v. Kiesel,* 247 Or 528, 431 P2d 262 (1967).[3]

---

[2] Dictum in *Burch v. Peterson,* 207 Or 232, 236, 295 P2d 868 (1956), suggested that an occupier of land might be liable for injuries to a licensee caused by a trap or pitfall, the existence of which the occupier could have known by the exercise of reasonable care. *Fleck v. Nickerson,* 239 Or 641, 644-645, 399 P2d 353 (1965), held to the contrary and required that the trap or pitfall be known to the occupier.

[3] Contrast the duty of an occupier toward invitees. The occupier has a duty to make the premises reasonably safe for invitees, which duties include the duty to make the land reasonably safe for the invitee's use for the purpose of the invitation. This duty may include the duty to make repairs and to make an

2. As to activities on the land, the occupier has a duty to exercise reasonable care for the protection of a licensee. *Blystone v. Kiesel, supra,* 247 Or at 531.

Our prior decisions often have stated the duty of the occupier in terms of "active," "affirmative" or "passive" negligence. For example, in *Elliott v. Rogers Construction, supra,* the rule is stated that the occupier "* * * also owes a duty to a licensee not to injure the licensee through active or affirmative negligence. * * *" 257 Or at 431-432, n 1. *Blystone v. Kiesel, supra,* states that the occupier had a duty "* * * not to injure [the licensee] through active or affirmative negligence * * *." 247 Or at 530-531.

■■ Stating the duty in terms of active or passive negligence has led to confusion. This case is illustrative. Both the trial court and the Court of Appeals erroneously equated active negligence with commission, passive negligence with omission. The term "active negligence" or "affirmative negligence," as used in our previous decisions, refers to the negligent conduct of activities upon the land, and the term "passive negligence," as used in our previous decisions, refers to hazards arising from the physical condition of the land, the existence of which normally does not create liability in favor of an injured person.[4] "Active negligence" does not equate with commission; passive

---

inspection to discover any condition which creates an unreasonable risk of harm. *Mickel v. Haines Enterprises, Inc.,* 240 Or 369, 371-372, 400 P2d 518 (1965).

[4] As stated, "passive negligence," in this context, generally refers to the existence of hazards arising from the condition of the land. It has been said that the occupier "* * * [has] the duty to use reasonable care not to injure [the licensee] through any affirmative or active negligence * * *, *as distinguished from passive negligence."* (Emphasis added.) *McHenry v. Howells,* 201 Or 697, 702, 272 P2d 210 (1954). Use of the term "passive negligence" is confusing because the very word "negligence" suggests conduct below the standard of reasonable care. Yet, in the context of the liability of an occupier, the term "passive negligence" has been equated with the existence of injury-causing conditions, the maintenance of which is not below the standard of reasonable care, and the existence of which does *not* create liability. *McHenry v. Howells, supra,* 201 Or at 703-704. *See also Burch v. Peterson,* 207 Or 232, 234, 295 P2d 868 (1956).

One "sense" of the active/passive dichotomy, as seen from our previous decisions, is that unreasonably dangerous active conduct—active negligence—is prohibited, but unreasonably dangerous passive conduct—passive negligence—is permitted. The rule applicable to conditions of the land is better stated without reference to "passive negligence" along these lines: As to conditions of the premises, the occupier is liable to licensees only for injuries arising from conditions the existence of which was known to the occupier, which might cause injury to the licensee notwithstanding the use of reasonable care by the licensee.

negligence" does not equate with omission. *See Elliott v. Rogers Construction,* 257 Or 421, 479 P2d 753 (1971) (highway contractor not liable to licensee injured because of condition of an unopened highway); *Blystone v. Kiesel,* 247 Or 528, 532, 431 P2d 262 (1967) (homeowner liable to licensee when homeowner was running down the hallway and collided with the licensee); *Burch v. Peterson,* 207 Or 232, 234, 295 P2d 868 (1956) (homeowner not liable to social guest who was injured when a step gave way). It would be better if we cease to refer to "active" or "passive" negligence, and state the rule in terms of conditions upon or within the premises as contrasted with activities carried on upon the premises.

Whether a school district is conducting activities at a public park not owned or controlled by the district or in a school gymnasium owned and controlled by it, the risk of injury from such activities to persons whose presence is known may be similar, even identical. The fortuitous circumstance that the plaintiff was standing on land belonging to the defendant is largely irrelevant in a case where injury arises from an activity, *Blystone v. Kiesel, supra,* 247 Or at 532.[5] While there may be cases in which it may be difficult to say, as a matter of law, whether the injury arose from a "condition" of the premises, as distinct from an "activity" carried on upon the premises, no such difficulty exists here.

The plaintiff alleged that the defendant was negligent in conducting an activity without adequate supervision and without maintaining proper control. Although these allegations, in a sense, allege *omissions* to act, the carrying on of the activity without maintaining "proper control" is no more an omission to act than is the driving of an automobile on a highway without maintaining "proper control." In view of the fact that the plaintiff was lawfully

---

[5] In *Blystone v. Kiesel,* 247 Or 528, 431 P2d 262 (1967), we held that a licensee who sustained injury when the owner was running down a hallway and collided with the licensee might recover from the host, stating that where injuries arise from the occupier's "active operations * * * there is an obligation to exercise reasonable care for the protection of a licensee." 247 Or at 531. On page 532, quoting from *Potts v. Amis,* 62 Wash 2d 777, 787, 384 P2d 825 (1963), we stated:

"* * * 'The mere fortituous circumstance that this injury occurred while the plaintiff stood upon land belonging to the defendant should not relieve the latter of liability.' * * *"

on the premises, whether she was an invitee or a licensee, under the authorities cited above, the defendant had an obligation to exercise reasonable care in the conduct of its activities. *Blystone v. Kiesel, supra,* 247 Or at 531. As there is no difference in the standard of care defendant would have owed to an invitee, there is no need for this court to address the issue whether, or to what extent, the invitee-licensee dichotomy should be abrogated, the consideration of which has led to the delay in this case.

There being substantial evidence of defendant's negligence in conducting an activity on its premises, the decision of the Court of Appeals is reversed, and this case is remanded to the trial court to reinstate the judgment for plaintiff.

**LENT, J.,** concurring.

Plaintiff, an entrant on land occupied by defendant, was injured in her person by the activities of school children engaged in a game in defendant's school gymnasium. Plaintiff, in this action at law for damages for her injuries, asserted that negligence of the defendant was the cause of the injuries. Plaintiff had verdict and judgment, but upon motion of the defendant the trial court eventually entered judgment for the defendant notwithstanding the verdict.[1]

The Court of Appeals affirmed, and its opinion in support of that decision is found in *Ragnone v. Portland Sch. Dist. No. 1J,* 44 Or App 347, 605 P2d 1217 (1980). *See* note 1, *supra.* Because plaintiff had verdict, that court had before it the issue of whether it could affirmatively say that there was no evidence to support the verdict. Or Const Art VII (Amend), § 3; *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977). The Court of Appeals held, viewing the evidence in the light most favorable to the plaintiff, that she was a licensee, and defendant, therefore, only had a duty not to injure her by "affirmative or active negligence." Examining the specifications of negligence

---

[1] For the procedural course of this case, *see Ragnone v. Portland Sch. Dist. No. 1J,* 44 Or App 347, 605 P2d 1217 (1980); *Ragnone v. Portland School District No. 1J,* 289 Or 339, 613 P2d 1052 (1980); and *Ragnone v. Portland School District No. 1J,* 47 Or App 656, 615 P2d 1077 (1980).

submitted to the jury, the Court of Appeals found them to be "allegations of passive negligence as opposed to affirmative negligence" and therefore found that plaintiff's evidence in support of those allegations would not permit recovery by a licensee.

I concur in the majority opinion that the specifications of negligence submitted to the jury are charges of "active" negligence. There was evidence to support those charges and to support the finding of the jury that plaintiff was thereby injured. I am not satisfied to decide this case on that basis, however, for we allowed review to consider a question with far broader implications.

We allowed review, ORS 2.520, primarily to consider whether the nature of the duty of a land occupier to an entrant should continue to depend upon the status of the entrant as invitee or licensee.[2] I have come to the conclusion that it should not. At the outset I note that the legislature of this state has not codified the nature of the land occupier's duty to an entrant by reference to the entrant's status insofar as the facts of this case are concerned.[3] We are concerned, therefore, with law which, by judicial policy making, granted some measure of immunity to the land occupier at the expense of denying compensation to the injured entrant.

## The Tradition of Evolutionary Change in Judge-Made Law

My conviction that the nature of the duty of the land occupier to entrant should not depend upon the status of the entrant, as invitee or licensee, admittedly would be judicial policy making of the same kind which gave a measure of tort immunity to the occupier in the first place. I believe, however, that when measured against the history of the development of tort law, this change would be quite insignificant. When one sees how relatively recent is the necessity for demonstrating any fault on the part of a

---

[2] I do not now consider any change in the law as to the nature of the duty or the standard of care of the land occupier with respect to a trespasser.

[3] This opinion is not concerned, therefore, with the liability of a land occupier to entrants in those special situations addressed by statutory law, such as in the case of public recreational use of private lands, ORS 105.655 to 105.680, or public woodcutting on the land of others, ORS 105.685 to 105.697.

defendant in order to support recovery by an injured plaintiff, one should not be alarmed by a decision to change, in a quite minor degree, the judge-created immunity from liability for fault on the part of the land occupier.

Before there was any organized system of determining whether, and how, monetary costs of one person's injury should be shifted to another, it was the mere fact of the injury, regardless of any concept of fault in the sense of moral blameworthiness, which set in motion the response to the injury. The response was the blood feud. Commencement of the feud was not predicated upon finding some fault on the part of the injurer, other than the mere fact of the infliction of the injury, and the feud was not commenced for the purpose of compensating the injured or his family or clan but, rather, for the purpose of preserving the dignity of the family.

> "The primordial seed from which all crime and tort were to germinate was the blood feud that characteristically prevailed wherever there was discernible a barbaric society organized along the lines of blood kinship. The defense of the honor of the clan by resort to warfare against the harm-inflicting outsider and his entire kin was a traditional practice with roots deep in the need for survival of the family unit. The family outrage that cried for revenge lay not so much in the desire to enforce atonement for the bodily harm inflicted upon the wounded member as in the humiliation that was suffered by the entire family group. * * * *"

Malone, "Ruminations on the Role of Fault in the History of Torts," in U.S. Dept. of Transportation, *The Origin and Development of the Negligence Action* 1 (1970).

As Anglo-Saxon society emerged to the point of a system of government to rule over the families and clans which made up the society, that government suppressed the blood feud by developing substitutes for redress of the family's humiliation. In the case of death, the killer had to pay to the decedent's clan "wer," the official money's worth of the decedent according to his rank. In the case of non-fatal injury, the amount to be paid was called "bot." In both instances, however, it was the affront to the dignity of the clan which was addressed; the payment was not in any other sense deemed a form of compensation. *Id.* at 1-2.

The payment of wer or bot was not dependent upon fault in the sense we view that concept today as a basis for requiring compensatory damages in tort law. What the law would today regard as a mere remote condition rather than a cause of death was sufficient to require the payment of wer. The example is given by Professor Malone of one who takes another to see a wild beast show. If the wild beast killed the latter, the former had to pay:

> "The fact that primordial law was content to recognize even the most remote causal connection as being sufficient to justify the imposition of penalty is persuasive evidence of its indifference toward matters of fault or blameworthiness on the part of the person against whom the proceedings were instituted. * * *"

*Id.* at 3.

In the thirteenth century the action of trespass made its appearance, and at first it seems that there was some need for making out a showing of fault on the part of the defendant in the sense of proving the element of force or violence applied by the defendant to the person or property of the plaintiff. Even at first, however, there does not appear any requirement to show blameworthiness in any sense other than the use of that force or violence. As time went by, the necessity for showing even that miniscule element of fault diminished. For example, the plaintiff did not need to show any breaking of his fence or wall to establish a trespass to his close; the mere showing that the defendant quietly passed across the boundary of plaintiff's property sufficed. As Professor Malone says: *"Vi et armis* had assumed the artificiality of a mere pleading device." *Id.* at 9.

This "no fault" concept of liability carried through with respect to the escape of cattle and fire, injury from the use of firearms, and "non-natural" use of land as in the case of *Rylands v. Fletcher,* L R 3 H L 330 (1868), even though that was an action for trespass on the case rather than trespass. Professor Malone, at page 33, summarizes:

> "As the concept of tort liability emerged from its medieval chrysalis and became nascent in English history it afforded little indication that the existence or nonexistence of defendant's blameworthiness was a matter of much concern to the law. This held not only for the early Anglo-Saxon proceeding, but for its eventual successor, the suit in

trespass, and even for the later developed action of trespass on the case. The suit in case, however, did introduce the notions of *duty* and *neglect* which were destined to serve as the bases for the eventual appearance of the negligence requirement in the traffic cases later in the nineteenth century.

"* * * * *

"* * * We are likely to gain a deeper insight into the significance of fault (or the lack of it) by riveting our attention upon the particular type of human activity involved and the economic and social demands of the time and place than we can gain by paying reverence to the language of the judges as they have sought to be spokesmen for their own society." (Original emphasis)

The nineteenth century and the early part of this century have seen the rise of the notion that tort liability should ordinarily depend upon fault, primarily as expressed in the largely judge-developed and shaped field which we commonly denote as negligence law. Where strict liability principles have been dominant, it is because the judges have been chiefly concerned with the injured party's plight, i.e., with his security in the sense of deterrence of dangerous conduct and compensation for those injured by such conduct. A judicial insistence on fault as a condition of liability stresses a different concern, one for freedom of action and the importance of not unduly interfering by imposing liability "upon dangerous but useful activity." James, "Analysis of the Origin and Development of the Negligence Actions," in U.S. Dept. of Transportation, *The Origin and Development of the Negligence Action* 35, 36 (1970).

The transportation and industrial revolution of the nineteenth century, while creating wealth and eventually a high standard of living, exacted a high price in terms of safety. It was accepted that society should permit the operation of the mills and factories and the modern transportation systems despite the dangers inherent therein in order to achieve the desired goals of that society. It was considered that one should be able to carry on dangerous activity to produce economic wealth so long as he did not do so in a manner that created an unreasonable risk of harm to others. Thus, the courts responded to the changes of the century. The law of negligence arose; the concept of liability based upon fault became dominant. This dominance

lasted into the first third of this century, although erosion began early on.[4]

Erosion has been the result of both legislative and judicial action. Early in this century came the flood of legislation adopting worker's compensation laws. During the same period, judges were developing rules of vicarious liability which require payment of damages by one who has no personal fault for the plaintiff's injury. In the past 30 years we have seen inroads upon the dominance of the fault concept of liability in the judicial adoption of rules of strict product liability. Professor James catalogues several other examples in the article above cited at pages 41-43.

Against this background demonstrating that the law, as pronounced by judges, accommodates change, we

---

[4] "In the first quarter of the nineteenth cenury [sic], these hitherto disconnected threads of embryonic liability for negligence began to combine into a discernible principle of wider application, from which gradually emerged the modern concept of negligence as a separate basis of tort liability. Its rise broadly coincided with the Industrial Revolution, and was undoubtedly stimulated by the advent of machinery and the faster traffic along turnpike and railway. Untold new sources of risk and losses made their appearance, and confronted the law with problems which it was unable to solve by recourse to its inherited, archaic tort remedies. At this crucial stage of social and economic re-orientation, the courts responded to the call for a new pattern of loss-adjustment by fastening on the concept of negligence. *The axiom 'no liability without fault' was quickly raised to a dogmatic postulate of justice,* because it was best calculated to serve the interests of expanding industry and the rising middle class, in relieving them from the hampering burden of strict liability and conducing to that freedom of individual will and enterprise which was at the forefront of all contemporary aspirations. Borne by these forces, the negligence concept in little more than a century completely transformed the basis of tort liability. The measure of its success is attested by the fact that negligence litigation today overwhelmingly occupies the attention of the courts, and has proved so pervasive as to transform even the erstwhile strict liability of trespass. Helped by, and in turn assisting, the disintegration of the old forms of action, negligence became a unifying force of vast potential.

"But neither society nor law are static. The forces that moulded nineteenth century thought have long been spent, and the assumptions underlying the negligence concept are increasingly subjected to challenge. The individualistic fault dogma has been replaced by the mid-twentieth century quest for social security, and the function of the law of torts is today seen less in its admonitory value than in ensuring the compensation of accident victims and distributing the cost among those who can best bear it. As a result, the legal mechanism of negligence is being exposed to stresses which, in some areas at any rate, have already initiated a return to stricter liability. The gradual transformation of negligence, in response to this modern trend, will be observed throughout the ensuing discussion." Fleming, The Law of Torts 102-103 (5th ed 1977) (footnotes omitted; emphasis added).

now turn our attention to the measure of immunity that the law has accorded to occupiers of land for injuries to entrants resulting from the condition of the land or the activities conducted thereon by the occupier.

## The Creation of Immunity by
## Prescription of the Nature of Duty

Since we are concerned with a case in which the defendant is charged with negligence, we should start by stating what it is that constitutes negligence. That is not so easy as it might appear. Writing half a century ago, Professor Fowler V. Harper stated that "the word is still capable of several meanings." Harper, Law of Torts 152, § 66 (1933). One of the definitions which he seemed to approve as adequate was partly drawn from Restatement of the Law of Torts:

> "Negligence consists of conduct which 'falls below the standard established by law for the protection of others against unreasonable risk.' "

*Id.* at 157, § 68. A quarter of a century later, in the work Professor Harper co-authored with Professor Fleming James, it is stated that the "generally accepted view" is the definition found in the Restatement of the Law of Torts, § 282:

> "[N]egligence is any conduct * * * which falls below the standard established by law for the protection of others against unreasonable risk of harm."

2 Harper & James, Law of Torts 896, § 16.1 (1956). This definition is at least incomplete, for one must look elsewhere to find the "standard established by law." In the Restatement (Second) of Torts, that is found in § 283:

> " * * * the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances."

Dean Prosser has been, at the least, vague in offering a definition. In Prosser, Law of Torts 143, § 30 (4th ed 1971), he states the following in a discussion of the elements of a cause of action founded upon negligence:

> "1.   A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

"2. A failure on his part to conform to the standard required. These two elements go to make up what the courts usually have called negligence; but the term quite frequently is applied to the second alone. * * * "

Two pages later, Dean Prosser purports to quote Restatement of the Law of Torts, § 282, for the definition that negligence is conduct "which falls below the standard established by law for the protection of others against unreasonably *great* risk of harm." Prosser, supra at 145. (Emphasis added.) There is no explanation by the author as to why he misquoted the Restatement by adding the word "great" and changing the preceding word from an adjective to an adverb. On the following page of the text, Dean Prosser states that

"Negligence already has been defined as conduct which falls below a standard established by the law for the protection of others against unreasonable risk of harm",

and, by footnote, refers the reader back to the purported quotation from the Restatement. *Id.* at 146. There is nothing to indicate what significance the author attached to the presence or absence of the word "great" in the definitions he seemed to accept. It may be that the inclusion of the word was a mere matter of editorial oversight, for 104 pages later, at page 250, we find the following:

"Negligence, it must be repeated, is conduct which falls below the standard established by law for the protection of others against unreasonable risk. * * *"

This court has been something less than precise in its use of the term. For example, consider our statement in *Bertrand v. Palm Springs,* 257 Or 532, 536, 480 P2d 424 (1971):

"Negligence is conduct involving an unreasonable risk of harm, and among the factors to be considered are the likelihood that the actor's conduct will injure others, and the seriousness of the injury if it happens."

This statement is open to criticism because, although negligence is conduct "involving" an unreasonable risk of harm, conduct is not negligence, under the "generally accepted" definition of Harper and James, *supra,* unless it falls short of what a reasonable man would or would not do in the same or similar circumstances to protect another (or himself, for that matter) against the unreasonable risk of

harm. In this last respect the statement in *Bertrand* is deficient in not taking into consideration the relationship between the magnitude of the risk and the utility of the actor's conduct. *Cf.* Restatement (Second) of Torts, § 291:

> "Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done."

In *Shepler v. Weyerhaeuser Company,* 279 Or 477, 491, 569 P2d 1040 (1977), n. 15, we quoted with apparent approval Fleming, The Law of Torts 111 (3rd ed 1965):

> "Negligence is conduct falling below the standard established for the protection of others against unreasonable risk of harm. This standard of conduct is ordinarily measured by what the reasonable man of ordinary prudence would do in the circumstances."

This definition is probably as precise as any we are apt to find or construct, although we are not sure what is the effect, or intended effect, of the modifier "of ordinary prudence," which Professor Fleming adds to the Restatement definition as presently found in the combination of Restatement (Second) of Torts, §§ 282 and 283. He seems to indicate that "ordinary prudence" is a term which helps the trier of fact to determine what is reasonable or foreseeable. Fleming, The Law of Torts 107 (5th ed 1977).

This concept of negligence is much like that expressed in an early leading case on the subject, *Brown v. Kendall,* 60 Mass (6 Cush) 292 (1850),[5] in which the court held that the plaintiff could not recover unless he could show that defendant's act which injured plaintiff was either intended to cause the harm or was the result of the defendant's failure to use ordinary care. The court went on to express what it meant by "ordinary care":

> "In using this term, ordinary care, it may be proper to state, that what constitutes ordinary care will vary with

---

[5] That cause was actually brought in trespass rather than case, but is recognized as being one of the very early cases to apply the modern concept of negligence, with its emphasis on fault and concern for the actor rather than the victim. *See* James, Analysis of the Origin and Development of the Negligence Actions" in U. S. Dept. of Transportation, *The Origin and Development of the Negligence Action* 41 (1970).

the circumstances of cases. In general, it means that kind and degree of care, which prudent and cautious men would use, such as is required by the exigency of the case, and such as is necessary to guard against probable danger."

60 Mass (6 Cush) at 296. It appears that the concept of what is negligence has remained about the same over the years from *Brown v. Kendall, supra,* until the present.

For there to be a cause of action for negligence, there must be some duty, recognized by law, on the part of the actor requiring him to conform to the standard of care above discussed, a breach of that duty and resulting injury. *See* Prosser, *supra* at 143, § 30.

## Partial Immunity for the Land Occupier

Almost contemporaneously with the onset of the cause of action for negligence, the judges recognized that to allow juries to determine whether a defendant was negligent simply by inquiring whether defendant had comported himself as would the reasonable and prudent man in the circumstances, would give too much leeway to the factfinders. Their authority to determine whether a defendant's conduct fell below that standard could be circumscribed by adopting rules as to the nature of the duty required by the law in various relationships between defendant and plaintiff.

"Apprehensive of subjecting defendants to the uncontrolled arbitrament of unsympathetic juries, the new formula ensured retention of a large measure of judicial control by the expedient of dividing persons entering land into distinct categories, fixed by reference to the purpose of their visit, with corresponding and precisely defined standards of care owed to each."

Fleming, *supra* at 432. (Footnote omitted.) Thus did Professor Fleming express that circumscription with respect to the liability of land occupiers to entrants.[6]

In footnote 1 to the material just quoted, Professor Fleming cites *Indermaur v. Dames* (1866) L.R. 1 C.P., 274, and *Gautret v. Edgerton* (1867) L.R. 2 C.P. 371. Each of those cases involved injury (death in the second)

---

[6] I do not agree with Professor Fleming that it is the standard of care which was defined, except indirectly. The standard of care was not professedly changed. It was the nature of the duty which the courts purported to define.

to a plaintiff in a fall caused by the condition of the real property. In *Indermaur* the plaintiff fell down a shaft, and his verdict was upheld because his evidence showed him to have been what would be today classified as an invitee. Because of that the court held that the defendant occupier of the real property owed to plaintiff a duty to fence the shaft, warn him of its presence, or illuminate the floor so as to make the shaft visible. In *Gautret* the plaintiff's decedent fell into a hole on defendant's land while crossing the land. The circumstances of the crossing were such that decedent would be today classified as a licensee. Defendant's demurrer to the declaration was sustained on the basis that there was no duty on the part of the defendant land occupier to fence the hole or warn decedent of its presence because he was not on the land in connection with the business of the defendant but was merely being allowed by the defendant to pass across the land on decedent's own errand.

These two cases were not the first to describe the nature of the occupier's duty according to the status of the entrant-plaintiff, for the reports show that both counsel and the court were aware of earlier cases of the same tenor. These cases do well demonstrate, however, that the judge, by shaping the nature of the duty according to the status of the entrant, could prevent a plaintiff from recovering whether or not a defendant's conduct fell below that which a reasonably prudent person would have exercised to prevent another from falling into a hole. This was done by simply announcing that in the case of the licensee there was no duty to exercise the same care that would have been required to guard the invitee against an unreasonable risk of harm. In other words, an immunity from liability for such injurious conduct was judicially granted to the occupier with respect to the licensee.

Those early cases were concerned with the condition of the real property. The same sort of judicial policy making seems to have resulted in the land occupier owing a different duty to the licensee than he does to the invitee with respect to the activities of the occupier on his land.

"Licensees—'gratuitous,' 'bare,' or 'mere'—enter land with the occupier's permission but only for their own purposes which are not connected with the occupier's interests. To

> them the occupier owes a duty to warn of concealed dangers of the premises which he actually knew about, and a duty to refrain from unreasonably dangerous *active* conduct — which would generally mean to take reasonable precautions in carrying on activities which might be injurious to licensees. [Original emphasis] * * * Whatever the test of an invitee, the occupier owes him the affirmative duty of care to discover conditions of the premises that may be unreasonably dangerous for the invitee, and either to remedy the defect or acquaint the invitee with the danger. The *occupier* also *must refrain* from conduct which is foreseeably and unreasonably dangerous to his invitee." (Emphasis added; footnotes omitted.)

2 Harper & James, *supra* at 1431. It is clear that, with respect to the condition of the premises, the duty of the occupier to the licensee differs materially from that owed to the invitee. With respect to activities carried on, however, the difference is not so pronounced; it appears that while the occupier owes to the licensee the duty only to take reasonable precautions in carrying on activities on the land, he may owe to the invitee the duty to refrain altogether from the activity if that is necessary to avoid an unreasonable risk of harm to the invitee.

The decisions of the trial court and of the Court of Appeals turn on an assumption that there is a difference in the nature of the duty owed to the licensee with respect to activities of the occupier than is owed to the invitee. That, of course, has also been the position of the defendant at all stages of this case.

### Dissatisfaction with Predication of Duty upon Entrant Classification

The system of predicating the nature of duty owed upon the classification of the entrant has given rise to much criticism.

> "The system of rigid categories of trespasser, licensee or invitee, into one of which the plaintiff must be forced to fit, has long made legal writiers unhappy, and has disturbed some judges, particularly since there are cases which are difficult to dispose of under any of the three specifications. * * * " (Footnotes omitted.)

Prosser, *supra* at 398, § 62. The system has been productive of an inordinate amount of grist for the appellate judicial mill.

"This emphasis on categories and label involves a high degree of formalism which experience has proved to be a fertile source of unrealistic distinctions, capricious results *and all too many appeals on what should be questions of fact* but are distorted into questions of law. * * *" (Emphasis added.)

Fleming, *supra* at 432.

"The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. As new distinctions have been spawned, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards 'imposing on owners and occupiers a single duty of reasonable care in all the circumstances.' " (Footnotes omitted.)

*Kermarec v. Compagnie Generale,* 358 US 625, 630-631, 79 S Ct 406, 410, 3 L Ed 2d 550, 554-555 (1959).

Dissatisfaction with the system in the country of its birth led to its abolishment by statute, The Occupiers' Liability Act, 1957, 5 & 6 Eliz II, which became effective January 1, 1958. The statute is not concerned with the nature of the occupier's duty to trespassers; rather, it is to impose a single duty to all lawful visitors. The statute expressly provides that the persons to whom the duty is owed are the same "as the persons who would at common law be treated as * * * invitees or licensees." § 5(1).

"The 'common duty of care' is defined by section 2(2) as 'a duty to take such care as in all the circumstances is reasonable to see that the visitor will be reasonably safe in using the premises for the purpose for which he is invited or permitted by the occupier to be there.' "

Payne, *The Occupiers' Liability Act,* 21 Mod L Rev 359, 360 (1958). The question immediately arises as to what has

been the experience with the statutory change. According to Professor Fleming:

"After more than a decade's operation in the United Kingdom and New Zealand, this reform is now being seriously considered for adoption elsewhere, including Australia and Canada. A prominent concern in the past has been over thereby abandoning valued controls over juries; but actually the long-standing prejudice against juries in this field is no longer anywhere near justified, if it ever was. Juries are often composed of property owners themselves and, even if the private householder is still perhaps generally uninsured against public liability, most of the claims actually involve industrial and business premises which, far from deserving a judicial subsidy, offer a suitable channel for loss distribution. * * *" (Footnotes omitted.)

Fleming, The Law of Torts, at 432-433.

Shortly after the mother country proceeded to abolishment of the occupier's partial immunity to claims of the injured licensee, the courts of the American states began to examine the continuing validity of the grant of immunity. As noted above, the questioning of the premises of immunity did not explode full-blown on the scene; rather, criticism by legal writers had been going on for many years. It is generally regarded that the leading case on this side of the Atlantic in rejecting the rule that the nature of duty should depend almost entirely on the status of the entrant is *Rowland v. Christian,* 69 Cal 2d 108, 443 P2d 561, 70 Cal Rptr 97 (1968). In that case the occupier knew that a faucet handle in the bathroom was defective. Knowing that the social guest-licensee was about to use the bathroom, the occupier failed to warn the licensee of the defect. The handle broke while the entrant was using it, severely injuring the entrant's hand. In reversing a summary judgment for defendant, the California Supreme Court, going beyond what might have been necessary to dispose of the case before it,

"rejected the status categories as anachronisms and held that all premise liability cases should henceforth be decided under the general negligence formula."

Hawkins, *Premises Liability After Repudiation of the Status Categories: Allocation of Judge and Jury Functions,* 1981 Utah L Rev 15, 22 (1981) (hereinafter cited as *Hawkins).*

Professor Hawkins finds that since 1968, eight jurisdictions have followed California's lead: Hawaii, Colorado, the District of Columbia, Rhode Island, New York, New Hampshire, Louisiana, and Alaska. He finds that five other states have repudiated the licensee-invitee distinction as a basis of fixing the nature of the occupier's duty, but have retained the occupier's limited duty with respect to trespassers: Minnesota, Massachusetts, Wisconsin, North Dakota and Maine. On the other hand, he finds that seven states have recently declined to reject the status categories and have affirmed them: Alabama, Florida, Kansas, Mississippi, Oklahoma, Texas and Utah. Another seven appellate courts have deferred to the legislature or a higher court as to whether the change should be made: Arizona, Delaware, Illinois, Maryland, Missouri, New Jersey and Oregon, this state in *Ragnone v. Portland Sch. Dist. No. 1J,* 44 Or App 347, 605 P2d 1217 (1980). The author finds that three states have reserved the question for later consideration: Idaho, Washington, and Maryland.[7]

Professor Hawkins observes that most commentators have applauded the line of cases effecting change in the traditional rules; however, there has been adverse comment from other scholars. Probably the chief disagreement has come from Professor James A. Henderson, Jr., writing in 51 Ind L J 467-527 (1976), under the title, *Expanding the Negligence Concept: Retreat from the Rule of Law.* Professor Henderson is of the opinion that the changes amount to judicial abdication of responsibility and place in the hands of the factfinders for resolution issues of law rather than fact. Professor Henderson sees this change as being one aspect of what he terms "negligence-under-all-the-circumstances lottery." 51 Ind L J at 525.

---

[7] Professor Hawkins cites Maryland for both deferring to other authority and reserving the question for further consideration.

This court was invited in *Sargent v. Inger,* 274 Or 811, 548 P2d 1303 (1976), to discard the distinction between licensee and invitee, but found it inappropriate to consider the change because the evidence was insufficient for plaintiff to prevail even had she been an invitee.

## Abolishment of the Distinction between Licensees and Invitees

I would have this court follow the lead of the five jurisdictions listed by *Hawkins* as electing to treat alike persons lawfully on the property. In each of those jurisdictions the court announced a rule to be applied whether the injury was due to activities or to condition of the premises.[8] In four of the cases the injury was due to a condition; in the North Dakota case the injury was from a dog of the occupier. In the case at bar we are concerned with facts in which the entrant-licensee was injured as a result of activities on the defendant-occupier's premises. The majority has elected to forego any decision concerning injury from the condition of the premises until that case is before us.

Keeping in mind that the common law distinction with which we are concerned was a product of the mores and values of a society which accorded to the landowner virtual sovereignty over his land, I believe the distinction no longer has validity in today's society. The courts have recognized this by devices to avoid the consequences which flow from the rigid early classifications. We find subcategories of almost infinite gradation: "invitee," "business invitee," "business visitor," "licensee," "licensee by permission," "implied invitee," "naked licensee," "bare licensee," "mere licensee," "implied licensee," "social licensee," "licensee by invitation," "gratuitous licensee," "social guest," etc. Each time a court invents a new label, it is for the purpose of reaching a result at odds with the law describing the nature of the duty owed to a less favored entrant. There is no reason in logic to perpetuate this kind of decision making.

"The realities of modern life teach us that these labels are today irrelevant to the jury's task. Personal status no longer depends on one's relation to real property. With urbanized society comes closer living conditions and a more gregarious population. * * * It is contrary to reason to accept as a settled principle of law that * * * [an occupier] actually varies his conduct according to the status of those who walk across his boundaries."

---

[8] The cases and jurisdictions are as follows: *Peterson v. Balach,* 294 Minn 161, 199 NW2d 639 (1972); *Mounsey v. Ellard,* 363 Mass 693, 297 NE2d 43 (1973); *Antoniewicz v. Reszcynski,* 70 Wis 2d 836, 236 NW2d 1 (1975); *O'Leary v. Coenen,* 251 NW2d 746 (ND 1977); and *Poulin v. Colby College,* 402 A2d 846 (Me 1979).

*Smith v. Arbaugh's Restaurant, Inc.,* 469 F2d 97, 102-103 (DC Cir 1972) (footnotes omitted).

Perpetuation of the traditional distinction favoring the free use of land without due regard to the personal safety of those we have classified as licensees is out of place in the last quarter of the twentieth century. Our modern complex society must deal with the problem of allocating the costs of human injury. We have abandoned the concept that the cripple must make his way on the street corner begging. One way or another, the cost of minimally feeding, clothing and sheltering the injured will be distributed. I agree with the Supreme Judicial Court of Massachusetts:

> "The problem of allocating the costs and risks of human injury is far too complex to be decided solely by the status of the entrant, especially where the status question often prevents the jury from ever determining the fundamental question whether the defendant has acted reasonably in light of all the circumstances in the particular case."

*Mounsey v. Ellard,* 363 Mass 693, 707, 297 NE2d 43, 51 (1973).

I would that this court would now say that the occupier's duty will be the same to a licensee as it is under the present state of the law to an invitee. Adoption of that concept would not make the occupier an insurer of the safety of the entrant; neither would it leave the trial judge and jury without guidelines. The court would still take from the jury those cases in which it could say that the actor's conduct clearly meets the required standard of care or clearly falls below it.

> "Implicit in this process is the assumption that judges as well as juries know something about the kind of conduct that is deemed acceptable or not acceptable in the community and that, at least at the higher and lower ends of the continuum of that standard, the court can say that the conduct does or does not meet the standard."

*Stewart v. Jefferson Plywood Co.,* 255 Or 603, 607-608, 469 P2d 783, 785 (1970). In discharging their respective functions, the courts and the juries would still be concerned with the factors which have been applied in the past with respect to occupier vis-a-vis invitee.

## Negligence in the Case at Bar

Since plaintiff's jury verdict and judgment thereon were set aside by the trial court entering judgment notwithstanding the verdict, we must reinstate her judgment unless there is no evidence to support the verdict. Or Const Art VII (Amend), § 3. Before this court, plaintiff is entitled to have accepted as true all evidence and inferences therefrom in the light most favorable to her. *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 811, 562 P2d 545, 547 (1977). The jury's verdict establishes the facts recited in the majority opinion.

In this case evidence was presented at trial that teachers were instructed not to leave classes unsupervised. The evidence is uncontroverted that plaintiff's injury occurred when she was knocked down by a student in an unsupervised class. Evidence was introduced that such occasions as the one attended by plaintiff were common at the school and condoned by the school administration, and that plaintiff was specifically invited to attend the event. From this evidence it was plausible for the jury to conclude that failure to supervise a physically active gym class was conduct creating an unreasonable risk of injury to plaintiff, and that the circumstances of plaintiff's presence, the availability of reasonable safeguarding, and the nature of plaintiff's activities were not such as should preclude recovery.[9]

I agree that the decision of the Court of Appeals must be reversed, and this case be remanded to the trial court to reinstate the judgment for plaintiff.

---

[9] Plaintiff was found to be partially at fault for her injuries, and her damages were reduced accordingly.